COMMONWEALTH *vs.* ROGER A. LAZAROVICH.

No. 89-P-95.

Franklin. September 15, 1989. - December 19, 1989.

Present: ARMSTRONG, KAPLAN, & SMITH, JJ.

*Mayhem. Evidence,* Consciousness of guilt. *Joint Enterprise.*

At the trial of a father charged with committing mayhem upon his two
and one-half year old child, the evidence, which included proof as to the
child's disabling and disfiguring injuries, the location of the parents at
all relevant times, and the parents' behavior indicating consciousness of
guilt, was sufficient to warrant the jury in finding the defendant guilty,
either individually or on the basis of a joint venture between him and
the child's mother. [148-156]

INDICTMENT found and returned in the Superior Court De-
partment on February 17, 1987.

The case was tried before *Charles R. Alberti,* J.

*Richard Zorza,* Committee for Public Counsel Services,
for the defendant.

*Ariane D. Vuono,* Assistant District Attorney, for the
Commonwealth.

KAPLAN, J. This is a child abuse case in which the father,
Roger Lazarovich, was convicted, after trial by jury, of the
crimes of mayhem and assault and battery upon his daugh-
ter.[1] Sentence of imprisonment followed on the mayhem con-
viction; the assault indictment was placed on file with the de-
fendant's consent. By motion for a required finding at the
close of the Commonwealth's case, the defendant challenged
the sufficiency of the evidence to support the judgment of
conviction of mayhem. The trial judge denied the motion, ex-

---

[1]The defendant was also indicted for assault with a dangerous weapon,
but this was nol prossed before trial.

The wife Janice was indicted for the same crimes as the defendant, but
her case was severed and does not figure on this appeal.

plaining his ruling in a memorandum. He also denied a postverdict motion for a required finding or for a new trial. We agree in substance with the judge's view, and we affirm the judgment and the denial of a new trial.

1. In the evening of Saturday, January 24, 1987, Roger and his wife Janice brought to the emergency room of the Berkshire Medical Center their daughter Laura, then two and a half years old. The child was very ill and immediately engaged the anxious attention of the doctors. Upon superficial inspection, the child was seen to be deeply comatose; motionless, except as her left arm and leg jerked spontaneously; covered over her body with bruises of various shades and sizes; and exhibiting fractures of the skull and two long bones. The doctors were immediately suspicious of the parents' story that the injuries were caused by the child's fall from a "potty" seat.

Dr. Edward Galla, the emergency physician, evidently acted to initiate a dispatch call which summoned to the Center a "protective investigator" of the Department of Social Services, Michael Harrigan. We shall outline here the interviews conducted by Harrigan and subsequently by the State police which led to Roger's arrest and formed part of the Commonwealth's case at trial. We reserve to our point 2 details of the nature and permanence of the child's injuries.

Harrigan viewed Laura and then asked the parents (who had already spoken to the doctors) how the casualty occurred. Janice answered: In the early afternoon of that day, January 24, she was tending her two boys (aged sixteen months and a few months) in a room of the trailer in which the family lived. She heard a thud in the bathroom nearby and, rushing there, found Laura had fallen from a "potty" seat and was lying unconscious on the floor. Janice carried Laura outside, calling for Roger. The two tried to revive the child by applying snow to her face. It did not help. They brought the child back into the trailer. She was not breathing but began to flail her arms. Janice and Roger alternately held Laura's arms while the other attempted mouth-to-mouth resuscitation. Roger told Harrigan that, to open

Laura's closed mouth for this purpose, he used a child's spoon and in the process broke one tooth and bent another; for fear that Laura would swallow the teeth, Roger said he removed them.[2] He said "he would try anything." Frightened that Laura would not waken, he struck her on her face and chest. According to Janice, perhaps forty-five minutes after the fall Laura began to cry. Piling the three children and Janice into the family car, Roger drove from the trailer location in Plainfield to the Medical Center in Pittsfield. Such was the parents' account attributing the major damage to the fall.

On Monday, January 26 — by which time the doctors had more fully analyzed Laura's severe injuries — State trooper Robert Scott, assisting the district attorney, questioned Roger at the Center. Roger told much the same story Janice and he had told Harrigan, but added some features.[3] Upon the trooper's question whether anyone else was present when he was outside the trailer, Roger paused, then said, "I think Dave — I don't know his last name."[4] After another pause, Roger asked whether the trooper would talk with Dave. Told that "everyone up there" would be interviewed, Roger said, "Goddam it, you're going to find out anyway. This didn't happen on Saturday, it really happened on Friday. Everything else I told you is the truth. Laura was hurt by falling

---

[2] Roger brought the spoon and the teeth to the Center.

[3] Roger said he told Janice to fetch a neighbor who was an EMT (if so, there was no follow-up); in trying to waken Laura he had held her by the torso and shaken her but that "didn't look like such a good idea" and "her head was going back and forth awfully hard"; he had slapped her across the left side of her face and yelled while Janice banged with a spoon on a pan near the child's ear. He had extracted the teeth with tweezers.

[4] David Brinck vacationed in the largely empty trailer park at times in the winter. He testified that in the afternoon of January 23 he heard a yell from the direction of Roger's trailer and saw Janice hand Roger what looked like a child — "[i]t looked kind of limp." That evening Brinck asked Roger, shovelling snow, if everything was all right. Roger said no, but "he'd rather not discuss it." Next day, Roger asked Brinck to help jumpstart Roger's car, which Brinck did. Brinck entered Roger's trailer, saw a woman and two small children, and heard another child — it was a "kind of gargling . . . or a muffled sound" from "[o]ne of the other rooms."

off the potty seat." Asked why he had lied about the date, Roger said, "We knew what people would think." He said he knew Laura had a serious head injury because, when he shined light in her eyes, one eye did not respond. He said he didn't believe an ambulance could get through; the snow was very deep.[5]

That night, January 26, Trooper Scott with two other officers went to the trailer and conducted a search with the consent of Janice and Roger. They viewed the potty seat. In conversation thereafter, Roger said the sixteen month old boy, Anthony (then weighing twenty-five pounds), "was mean to Laura"; perhaps he pushed or struck Laura and caused a bump on the back of her head; the bump "might have bled into her head" and caused Laura to faint and fall off the potty seat.[6] When Trooper Scott asked how Laura came to suffer a fracture of her skull behind her left ear, Roger said he didn't think jail was the right place for women. Then he said, "Hypothetically, just hypothetically, what would happen to us if we put her up against the wall and we took turns on her?"

Trooper Scott placed Roger under arrest the following evening, January 27. At police barracks that night, Roger spoke about three previous fractures suffered by Laura. He had been left alone with her when she was fifteen days old. She began crying and would not stop. Frustrated, Roger "struck Laura in the head with his fingertips." It was with "rather great force," judging from Roger's reenactment of the blows, and from the fact itself that the skull was fractured. This show of what could be taken as Roger's hostility or malice toward Laura was matched by testimony indicating similar

---

[5]According to the testimony of Raymond Bolduc, owner of the trailer camp, there were telephones within relatively short distances from the Lazaroviches' trailer. Bolduc's wife was an EMT.

[6]Roger first told the story of the fall from the potty to Margaret Boyd, a registered nurse who saw Laura as she arrived at the Center. According to Boyd, when she pointed out that some of the bruises were not new and asked what else had happened, Roger said, "You'll have to ask my wife."

hostility on Janice's part.[7] There was, according to Roger, a second skull fracture around that time when Janice was bathing Laura, and Laura slipped and struck her forehead on the faucet of the bathtub. Again, Roger, startled while sitting in a rocking chair with Laura, to prevent her falling from his lap to the ground, grabbed her leg "rather violently" and thus fractured it.[8]

Another officer, Gerard Gagne, who participated in Roger's arrest, interviewing Roger, asked whether it was not true that Laura was injured before the fall — that the injury made her dizzy and lose consciousness and therefore she fell. Roger "indicated to me [Gagne] with an up and down nod of his head . . . he acknowledged what I had asked him." Gagne asked Roger when (specifically) Laura was hurt. Roger said, " 'I can't tell you that . . . . I've got a few aces, I've got a trump card up my sleeve,' or something to that effect."

2. We are able to say that the gross injuries to Laura occurred in the interval from January 8 to January 23, 1987,[9] when, according to testimony, Roger and Janice in their isolated spot had exclusive, or nearly exclusive, access to Laura; and very likely the injuries mainly occurred in fact on January 23, as Roger said. It was on January 8 that Jayne Marsh-Babij, a social worker for the Department of Social Services, having observed the previous day a cut on Laura's face and black and blue marks on both cheeks and across the forehead, brought the child and Janice to Dr. Charles Brummer, a family practitioner at the Worthington Health

---

[7]Bolduc testified that he was present in the Lazarovich trailer on an occasion shortly before Christmas, 1986. Laura was playing with her food. Janice started yelling, and went over to the child; there was a thump and Laura lay on the floor.

[8]Early in Laura's life after the events just mentioned, the New Jersey authorities (the Lazaroviches were living there at the time) caused her to be placed in a foster home, thereafter she was taken in by the maternal grandmother, and it was not until her twentieth month that she was returned to the parents. (The New Jersey agency was in touch with our Department of Social Services.)

[9]The indictments dated the offenses as between January 16 and 24, approximately.

Center. Dr. Brummer did a routine examination of Laura's head and neck and a neurologic examination. He did not quarrel with Janice's statement that the marks on Laura's face resulted from a fall on January 6 as she climbed the stairs to the trailer; apparently he saw no recent gross injuries; he testified, however, that he found Laura "developmentally delayed" with low verbal ability.

Four physicians, Dr. Edward Galla, Dr. Gerald Zupruk, a neurosurgeon, Dr. Joel Curran, a pediatrician, and Dr. John Gault, an ophthalmologist, treated Laura on January 24-26. They found reason to disbelieve the parents' story linking the injuries to a minor fall. The individual findings, to which they testified, may be taken together and much abbreviated and outlined thus.

There were multiple bruises, contusions, and abrasions across Laura's whole body; from the varying colors of the bruises, mostly to her head, arms, legs, and back, these injuries could be assessed to range in age from several days past to within twelve to twenty-four hours.

Laura had sustained fractures of the skull to the left side, of the right arm, and of the right collarbone, the first two fractures being recent and simultaneous, the third incurred somewhat earlier. The skull fracture was such as would be caused by strong trauma to the head, comparable to that which would result from a fall from a considerable height. This impact to the head had caused swelling and bleeding within the brain, which, implicating particularly the tissue on the left side, threatened impairment of the child's ability to move the right side of her body as well as impairment of her speech.[10] There also were retinal hemorrhages caused by severe force to the head.

The pediatrician summed up the evidence in a medical diagnosis of "battered child syndrome" consisting of the six classic elements: child under three years of age; bone injuries at different times; subdural hematomas (here with skull fracture); history given which does not fit the observed injuries;

---

[10]There was confirming testimony by Dr. George Stowe based on EEG's measuring the electrical activity of the brain.

soft tissue injury; evidence of neglect. This syndrome tends to exclude the likelihood that the injuries occurred by accident.[11] (The diagnosis was confirmed by testimony of Dr. Brian Blackbourne, a forensic pathologist, based on his reading and analysis of the medical records.)

As to factors bearing on the permanence of Laura's injuries, we summarize first the testimony of Dr. Edward Hart, a pediatric neurologist, who treated Laura at the Kennedy Memorial Hospital from March 5 to September 10, 1987. The child suffered, he found, from recurrent otitis media (ear infections); retinal hemorrhage (bleeding into the back of the eye); aphasia (loss of language from time to time); right hemiparesis (weakness and stiffness in right arm and leg); visual field defect, due to loss by atrophy or shrinkage of tissue in the back part of the brain. The testimony of Dr. Edward L. Kazarian, an ophthalmologist, who examined Laura in February, 1988, about a year after the event, confirmed a prognosis by Dr. Hart of the permanence of the damage to Laura's eyesight: the optic nerves had been impaired and would not regenerate; there was loss of peripheral vision on the right side of each eye.

Two witnesses testified to Laura's inability to function normally to the time of trial: Jean Ashlaw, a registered occupational therapist with a pediatric specialty, and Ellen Courtney, an early-childhood special needs teacher. Laura had difficulty opening her right hand and extending her right arm; thus she could not readily manipulate objects with her right hand, and that hand tightened and came up to her chest automatically when she ran; she had trouble bearing weight and even in putting on a shoe. Her right arm in fact was almost always in a bent condition. Her defective eyesight caused Laura to misjudge spaces so that she made mistakes in trying to get through doorways.

---

[11]See, with regard to the battered child syndrome, *Commonwealth v. Cutler,* 356 Mass. 245, 247, 248 (1969); *Commonwealth v. Cadwell,* 374 Mass. 308, 316 (1978); *Commonwealth v. Labbe,* 6 Mass. App. Ct. 73, 76-77 (1978); *People v. Jackson,* 18 Cal. App. 3d 504, 506-508 (1971).

3. "The mental state required for conviction of mayhem or assault with intent to maim is satisfied by direct or inferential proof that the assault was intentional, unjustified, and made with the reasonable appreciation on the assailant's part that a disabling or disfiguring injury would result." *Commonwealth* v. *Davis*, 10 Mass. App. Ct. 190, 196 (1980). And see *Commonwealth* v. *Farrell*, 322 Mass. 606, 619 (1948); *Commonwealth* v. *Hogan*, 7 Mass. App. Ct. 236, 244, *S.C.*, 379 Mass. 190 (1979).

Here, as shown at length at point 2, there is plain, in fact indisputable, proof of disabling and disfiguring injuries which will oppress the victim for the rest of her life.[12]

The jury could readily accept the diagnosis of "battered child syndrome" and its intrinsic meaning, namely, that the injuries came about, in all probability, by conscious (intentional) acts. And Roger, and Janice as well, were physically located continuously so as to be available to commit these acts; on the record, responsibility cannot fairly be cast on anyone else.

As the *Davis* and other cases teach, the substance of the requisite mental state for mayhem is that the actor shall be aware that what he or she is doing will eventuate in grievous damage of the victim (an element of willingness that this should happen naturally accompanies the awareness). In most if not all mayhem prosecutions, this mental condition is established inferentially, rather than directly; and so here.

The jury could infer from the episode of the first skull fracture by Roger, and from Bolduc's account of Janice's punishment of Laura in the trailer (see note 7, *supra*), that the parents were hostile toward this child. Next comes Roger's agreement with Gagne's suggestion that Laura was struck before any fall from the potty, and this the jury might well connect with Roger's "hypothetical," which presents the

---

[12]The pertinent part of the mayhem statute, G. L. c. 265, § 14, reads: "Whoever, with malicious intent to maim or disfigure, cuts out or maims the tongue, puts out or destroys an eye, cuts or tears off an ear, cuts, slits or mutilates the nose or lip, or cuts off or disables a limb or member, of another person, and whoever is privy to such intent, or is present and aids in the commission of such crime, . . . shall be punished . . . ."

picture of the parents taking turns in the beating. The jury could then assess the cruelty or callous indifference evinced by their waiting a day after the child's near death before bringing her to the hospital. From the abusive treatment of Laura over time and the severity of the final injuries, as found and described by the physicians, comes a particularly strong inference about the state of mind of anyone responsible. Compare the many instances where the nature of the injuries has entered into an appraisal of the animus with which they were inflicted: *Commonwealth* v. *Farrell*, 322 Mass. at 618-619; *Commonwealth* v. *Tucceri*, 9 Mass. App. Ct. 844, 845 (1980); *Commonwealth* v. *Hamm*, 19 Mass. App. Ct. 72, 80 (1984); *Commonwealth* v. *Mercado*, 24 Mass. App. Ct. 391, 395 (1987).

Evidence of consciousness of guilt could not itself justify a conviction, but a jury might take it as reinforcing other evidence of guilt. See *Commonwealth* v. *Mercado*, 24 Mass. App. Ct. at 400. Here we have the parents' falsehood, admitted by Roger when he saw there was no escape, about the day when Laura collapsed; also Roger's pitifully thin statement of little Anthony's supposed attacks on Laura as an explanation of her subdural bleeding.

Counsel for Roger suggests that his conviction cannot stand because, if it be granted on the present record that someone could be found guilty of the crime, that someone could as well be Janice as Roger. We say, as in a similar situation in *Commonwealth* v. *Mercado*, 24 Mass. App. Ct. at 395-396, that there is enough to establish the "individual guilt" of Roger, but in any case "it requires but a small shift of emphasis to find guilt . . . on a basis of joint venture" between Roger and Janice, a matter on which the jury were duly instructed in accordance with the authorities. See *Commonwealth* v. *Richards*, 363 Mass. 299, 308 (1973); *Commonwealth* v. *Soares*, 377 Mass. 461, 470 (1979); *Commonwealth* v. *Fidler*, 23 Mass. App. Ct. 506, 513 (1987). (And see the statutory text, note 12 above.) It matters not that it may have been Janice rather than Roger who struck the child at some climactic moment. The jury could find that

the parents were mutually supportive in their inhumane attitude toward the child and in abusing her physically and that they shared the mindset intrinsic to the crime.

The evidence rose well above the level required to repel a motion for a required finding: the question on such a motion is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Berry* v. *Commonwealth*, 393 Mass. 793, 794 (1985) (emphasis in original).

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*