COMMONWEALTH vs. JANICE L. LAZAROVICH.

Franklin. March 5, 1991. - June 24, 1991.

Present: LIACOS, C J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Mayhem. Child Abuse. Joint Enterprise. Practice, Criminal*, Instructions to jury, Deliberation of jury. *Battered Woman Syndrome. Intent. Mental Impairment. Evidence*, Relevancy and materiality, Relating to deliberation by juror. *Jury and Jurors.*

At the trial of indictments for assault and battery and mayhem, the judge's failure to instruct the jury that they could consider evidence of the "battered woman syndrome" when determining whether the defendant had the specific intent to commit mayhem on her child did not create a substantial risk of a miscarriage of justice where the defendant's trial strategy was to deny she had struck the child and to place the sole responsibility for her child's injuries on her husband. [472-477]

In a criminal case, the defendant failed to demonstrate that an extraneous influence may have affected the jury's impartiality, and the judge correctly denied the defendant's motion for a new trial without interviewing the jurors. [477-478]

INDICTMENT found and returned in the Superior Court Department on February 17, 1987.

The case was tried before *William H. Welch*, J., and a motion for a new trial was heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Lee A. Drizin* for the defendant.

*Ariane D. Vuono*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, Janice L. Lazarovich, was convicted by a jury of having committed mayhem and assault and battery on her two year old daughter (child). She was sentenced to a term of eleven to sixteen years on the mayhem conviction and a concurrent sentence of two and

one-half years on the assault and battery conviction to be served at the Massachusetts Correctional Institution at Framingham. The defendant appealed. We transferred the appeal to this court on our own motion.

It was the Commonwealth's theory during the trial that the defendant either abused the child herself or engaged in a joint venture with her husband, Roger Lazarovich, to abuse the child.[1] An expert testified that the defendant suffered from a condition known as the "battered woman syndrome." The judge instructed the jury that they could consider the battered woman syndrome when determining whether the defendant shared her husband's intent for purposes of establishing whether a joint venture existed between them to commit mayhem upon the child. The defendant argues that the judge erred in failing to instruct the jury that they could also consider the battered woman syndrome testimony to determine whether the defendant had the specific intent to commit the mayhem herself without the assistance of her husband. In addition, the defendant argues that the judge erred in denying a motion for a new trial based on an alleged extraneous influence on the jury's verdict. We affirm.

The jury were presented with the following evidence. On January 24, 1987, the defendant and her husband Roger took the child, who had been injured, to Berkshire Medical Center (Center). On that day, Michael Harrington, an investigator for the Department of Social Services, spoke to the defendant and to Roger regarding certain injuries suffered by the child. The defendant told Harrington that she was tending to her two boys (aged sixteen months and two months), when she heard a loud noise coming from the bathroom of the trailer where the family lived. She said she rushed to the bathroom and found the child lying unconscious on the floor next to her "potty" seat. The defendant picked up the child and took her outside, where Roger was shoveling snow. Both

---

[1] The defendant's husband was tried separately. He was also convicted of mayhem and assault and battery. The conviction of mayhem was affirmed, *Commonwealth* v. *Lazarovich*, 28 Mass. App. Ct. 147 (1989), and the conviction of assault and battery was placed on file.

parents attempted to revive the child by placing snow on her face. This failed; they went inside the trailer and tried mouth-to-mouth resuscitation, but the child's mouth was closed tight. Roger placed a spoon inside the child's mouth in order to open it. He broke one tooth and bent another. The defendant told Harrington that after forty-five minutes the child regained consciousness, and the couple took her to the Center.

Dr. Joel Curran, a pediatrician, examined the child on her arrival at the Center. Dr. Curran made a diagnosis of child abuse. He testified that the child had "developed multiple bruises, contusions of the body of different ages or different time periods. There were three fractures, the fracture of her right arm, the fracture of her right clavicle, and left skull fracture. . . . [T]here was a diagnosis of dehydration, anemia on the basis of laboratory tests, and a question of delayed development." Dr. Curran described the condition known as the "battered child syndrome". The child's injuries were consistent with the syndrome.[2] Dr. Curran opined that the child's injuries were not consistent with having fallen off a "potty" stool.

Dr. Gerald Zupruk, a neurosurgeon, examined the child the day she was admitted to the Center. Dr. Zupruk testified as to "extensive bruises involving the face, the torso, the extremities, and [they] seemed to be of various ages. Some were fading and some appeared fresh." Dr. George Stow, a neurologist, performed an electroencephalogram and found abnormal readings on both sides of the brain. Dr. John Gault, an ophthalmologist, testified that the child had blisters on both retinas which impaired her vision.

---

[2]Dr. Curran testified that "[t]he battered child syndrome definition involves injuries to multiple parts of the body including fractures usually of . . . [a]rms and legs, extremities, and skull usually involving some intercranial bleeding. In other words, bleeding into the brain or the tissue around the brain, including multiple soft tissue injuries to the body such as bruises or contusions. And usually in a child under age three and sometimes associated with neglect of the child. The major criteria is that injuries have appeared over a period of time and not all at one incident."

The Commonwealth also presented evidence regarding the long term effects of the child's injuries.[3] Dr. Edward Kazarian, a pediatric ophthalmologist, testified that, after twice examining the child in 1988, he concluded that her optic nerve had been damaged and that she had lost her right peripheral vision permanently. Dr. Edward Hart, a pediatric neurologist who treated the child during 1987, testified that the child suffered from aphasia (a language disturbance resulting from injuries to the left side of the brain), traumatic encephalatrophy (dysfunction of the brain and trauma as a result of injury), and a visual field defect (eye hemorrhage, optic nerve damage, and permanent loss of peripheral vision on the right side resulting from direct injury to the eye and damage to the left side of the brain).

The defendant testified on her own behalf. Her testimony was that she married Roger in November, 1983. The child was born in August, 1984. Most of her testimony was about the physical and psychological abuse which Roger inflicted on both the defendant and the child. One month after the child was born, the defendant left the child alone with Roger for the first time in order to run an errand. On her return, she found the child "fussing in her crib," with red marks on her face. The defendant took the child to the hospital where she was diagnosed as having a fractured skull. A few months later, the defendant saw Roger "squeezing" the child's leg. After Roger left for work, the defendant took the child to the hospital where she was diagnosed as having a fractured left tibia and a second skull fracture.

The defendant described how Roger became infuriated when the child wet herself. Sometimes when the child woke up wet, he placed her under a cold shower, yelled at her, and sometimes struck her in the face. Another time, when the child refused to eat, Roger shoved food down her throat with his fingers, not caring "if it hurt her or if she cried."

---

[3]The effect of these injuries is described in further detail in *Commonwealth* v. *Lazarovich*, 28 Mass. App. Ct. at 151-153.

The defendant also testified how, from the very beginning of their marriage, Roger hit her and forced her to have sex with him. One day, when the defendant was pregnant with her second child, Roger kicked her in the stomach, slapped her, and forced her to engage in oral sex. A few months later, when the defendant was seven months pregnant, he hit her on the head with a tire iron, and, when the defendant tried to call the police, he ripped the phone out of the wall and choked her with the cord.

Roger once locked the defendant in a closet for two hours. While trapped in the closet, the defendant heard him hitting the child while the child called to her mother for help. The defendant also testified how one night Roger arrived home drunk. The couple had a fight, and Roger threw the defendant on the floor. He then went to the children's room, and the defendant called the police. After the police left, Roger picked up a knife with one hand and the child's younger brother with the other and told the defendant that if she ever called the police again "he would cut [the boy's] f——— head off." Roger then put the boy down, and threw the defendant against a wall, rendering her unconscious. When the defendant woke up, the child was sitting next to her and "[the child] was hurt herself because he had beaten her up."

The defendant also testified regarding the events leading up to the visit to the Center on January 24, 1987. On January 23, 1987, at approximately 9 P.M., the defendant was tending to her two boys in their bedroom when she heard Roger in the bathroom yelling at the child. The defendant left the boys and walked to the bathroom. When she arrived, she saw Roger hit the child. Roger then told the defendant to go back to the boys. The defendant did so; shortly thereafter, she once again heard Roger yelling at the child, followed by a "thud" on the floor of the bathroom and a "bang" as Roger walked out the door of the trailer. When the defendant walked into the bathroom, the child was lying unconscious on the floor. As the defendant had told the DSS investigator Harrington, Roger and she attempted to revive the child. The defendant, however, admitted that, unlike what

she told Harrington, the child was injured on January 23, not on January 24. She stated that she had lied to Harrington because she was afraid of what Roger would do if she told the truth; she waited until the next day to take the child to the hospital because she was afraid of leaving the other two children with Roger.[4] Finally, the defendant testified that, except for a couple of spankings, she never struck the child.

Dr. Charles Patrick Ewing, a clinical and forensic psychologist, gave testimony regarding the battered woman syndrome, which is characterized by the physical and psychological abuse of a woman by her partner. Dr. Ewing stated that the syndrome runs in cycles consisting of three stages. During the first stage, there is mostly verbal abuse, with minor physical abuse. The second stage is characterized by an escalation of the abuse "until there is an explosive instance where the woman is physically beaten up." The third stage consists of a respite, with no abuse for a short period of time. This cycle continues throughout the relationship with a decrease in the time between the batterings.

Dr. Ewing testified that women who are abused "respon[d] with depression, with feelings of learned helplessness, feelings of being psychologically trapped in the relationship. That, of course, explains why many battered women stay in these relationships despite the fact [that] they are being abused." Dr. Ewing explained how abused women lose their self-esteem, and how most women who suffer from the syndrome are too ashamed to seek help.

Dr. Ewing testified that, based on a four-hour examination of the defendant, he concluded that she suffered from the battered woman syndrome. Dr. Ewing testified that the defendant's response to the abuse "was also typical of that of women suffering from this syndrome. She became depressed, fearful, suffering from learned helplessness, felt there was no

---

[4]The defendant testified that she waited until the following day to take the child to the hospital because "Roger wouldn't let me, and I wasn't going to leave her alone with him to go call a neighbor. I was scared. I was scared of Roger. I was scared of what he would do if I tried to leave and I couldn't get all three children out of the house."

way out, contemplated suicide, but couldn't see that as a way out because she feared what would happen if she left her kids — the situation that it would leave her children in. She felt trapped in the relationship."

During Dr. Ewing's testimony, the judge held a side bar conference to discuss the relevance of Dr. Ewing's testimony. Counsel for the defendant told the judge that the battered woman syndrome was relevant on the issue of intent, both as to whether the defendant herself committed the mayhem and as to whether she engaged in a joint venture with her husband to do the same. The prosecutor argued that the evidence of the syndrome was relevant only to the joint venture theory, since the defendant denied that she ever struck the child. The judge ended the conference by agreeing with defense counsel that evidence of the syndrome was relevant to both theories. During the charge conference, however, the judge stated that he was only going to instruct the jury that they could consider battered woman syndrome on the joint venture theory. Defense counsel did not object. The judge proceeded to instruct the jury, without objection by defense counsel, that they could consider the battered woman syndrome if it is "of assistance to you in deciding why the defendant did not leave the husband in this case. If that is a factor in your deliberations, you may consider it on that aspect of the case. And secondly, you may consider it on the aspect as to whether or not the defendant here was a joint venturer or had a joint enterprise in sharing her husband's criminal specific intent and his maliciousness."

1. *Jury instructions.* The Commonwealth's case against the defendant proceeded on two theories of guilt: Either the defendant committed the criminal acts, or she joined in a joint venture with her husband, who committed those acts.[5]

---

[5]"The test [for joint venture] is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Cunningham*, 405 Mass. 646, 649 (1989), quoting *Commonwealth* v.

The defendant argues that the judge erred in failing to instruct the jury that they could consider the battered woman syndrome when addressing the Commonwealth's first theory, namely whether the defendant, without the assistance of her husband, committed mayhem on the child.[6] Since defense counsel did not object to the judge's instructions, our review is limited to whether the charge was so erroneous that it created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Murray*, 396 Mass. 702, 705 (1986). *Commonwealth* v. *Sheline*, 391 Mass. 279, 291-292 (1984). See Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979).

We note as a preliminary matter that the issue before us is whether the judge's instructions were erroneous, not whether he allowed properly the admission of expert testimony on the battered woman syndrome. Whether such testimony is admissible is a matter which has not been decided in this Commonwealth. See *Commonwealth* v. *Moore*, 25 Mass. App. Ct. 63, 66 (1987).[7] For purposes of deciding whether the judge's instructions were erroneous, and, if so, whether they created a substantial risk of a miscarriage of justice, we will

---

*Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983).

It is not possible for us on this record to determine whether the jury, in finding the defendant guilty, concluded that the defendant committed the mayhem herself, or engaged in a joint venture with her husband to commit the mayhem, or both.

[6]The defendant's argument is limited to the mayhem conviction. The defendant does not seek a reversal of the conviction for assault and battery.

[7]We have held that evidence of a "child battering profile" is irrelevant and inherently prejudicial to the defendant. *Commonwealth* v. *Day*, 409 Mass. 719, 724 (1991). The "battered woman syndrome" differs from the "child battering profile" because the "battered woman syndrome" is directed toward a person's mental capacity to commit the crime. The "child battering profile" on the other hand was held irrelevant because "the mere fact that a defendant fits the profile does not tend to prove that a particular defendant physically abused the victim." *Commonwealth* v. *Day, supra* at 723. Thus, the prosecutor's use of a "child battering profile" as substantive evidence of guilt is inherently different from a defendant's claim that the requisite mental intent is lacking as a result of being battered.

assume, without deciding, that evidence of battered woman syndrome properly was admitted in this case.[8]

The language of G. L. c. 265, § 14 (1988 ed.), under which the defendant was charged,[9] providing for the guilt of an individual who "with malicious intent to maim or disfigure" commits certain disabling or disfiguring acts on another person, can be satisfied only by proof that the defendant had the specific intent to do the proscribed acts. *Commonwealth v. Hogan*, 7 Mass. App. Ct. 236, 244, *S.C.*, 379 Mass. 190 (1979). See *Commonwealth v. Farrell*, 322 Mass. 606, 619 (1948); *Commonwealth v. Davis*, 10 Mass. App. Ct. 190, 196 (1980). See also *Commonwealth v. Lazarovich*, 28 Mass. App. 147, 154 (1989). In *Commonwealth v. Grey*, 399 Mass. 469, 470-471 (1987), we stated that the jury should be permitted "to consider evidence of mental impairment at the time of the crime in deciding whether the Commonwealth has proved the defendant's specific intent."[10] We concluded in *Grey* that "the judge's failure on request to 'instruct the jury, on the issue of intent, that they should consider the de-

[8] The vast majority of courts which have ruled on the admissibility of the battered woman syndrome have done so in cases where the evidence has been used, if allowed, to support a claim of self-defense. See, e.g., *State v. Kelly*, 97 N.J. 178, 202 (1984); *State v. Koss*, 49 Ohio St. 3d 213, 218 (1990); *State v. Kelly*, 102 Wash. 2d 188, 195-196 (1984); *State v. Steele*, 178 W. Va. 330 (1987). See generally Annot., 18 A.L.R. 4th 1153 (1982 & 1990 Supp.). Self-defense was not an issue in the case at bar, since the victim was not the battering spouse.

[9] The mayhem statute reads in part as follows: "Whoever, with malicious intent to maim or disfigure, cuts out or maims the tongue, puts out or destroys an eye, cuts or tears off an ear, cuts, slits or mutilates the nose or lip, or cuts off or disables a limb or member, of another person, and whoever is privy to such intent, or is present and aids in the commission of such crime," shall be convicted of mayhem. G. L. c. 265, § 14.

[10] In *Grey*, the defendant admitted killing the victim. The defendant, however, argued that his mental retardation prevented him from having the specific intent to commit certain acts. The court stated that "[e]vidence tending to show that, in the circumstances, a defendant in a murder case did not intend the victim's death or serious injury is relevant, but not dispositive, as to whether the killing was committed with malice. The admission in evidence of the defendant's mental condition is appropriate because it bears on the question whether the crime of murder was committed at all." (Footnote omitted.) *Id.* at 470.

fendant's mental status on the day in question,' requires reversal of the conviction if there was evidence tending to show that, because of his mental condition, the defendant may not have formed a specific intent" to commit the crime. *Id.* at 471. See *Commonwealth* v. *Henson*, 394 Mass. 584, 593 (1985) (alcohol or drug use at the time of the crime may be considered in determining whether the Commonwealth proved the existence of a specific intent beyond a reasonable doubt). The defendant argues that, in light of *Grey*, the judge erred in failing to instruct the jury that they could consider evidence of the battered woman syndrome in determining whether the Commonwealth met its burden of establishing beyond a reasonable doubt that the defendant had the specific intent to "maim or disfigure" the child.

At trial, the defendant's tactic was to convince the jury that it was Roger, and not she, who injured the child. The defendant testified that Roger engaged in a brutal pattern of physical abuse of the child. The defendant also testified that, except for a couple of spankings, she never hit the child. During closing argument, defense counsel conceded that it was clear from the evidence that the child was not injured as a result of an accident, but was instead "intentionally . . . injured by the acts of another person, but that person was not [the defendant]. That person was her husband at the time, Roger Lazarovich."[11]

Even if we assume, for purposes of deciding this case, that the battered woman syndrome constitutes the type of mental impairment which juries may consider when determining whether a defendant formed the required specific intent, there was no substantial likelihood of a miscarriage of justice

---

[11]While defense counsel told the judge at a side bar conference held during Dr. Ewing's testimony that the evidence of battered woman syndrome was relevant as to whether the defendant committed the mayhem herself and as to whether she engaged in a joint venture with her husband to commit the mayhem, we think that, in light of the defendant's testimony and counsel's closing argument, it is clear that the defendant's strategy was to convince the jury that Roger was solely responsible for the child's injuries.

in the circumstances of this case. The defendant could have chosen to argue alternative defenses. She could have argued both that she did not hit Laura and that, if she did hit the child, she was incapable of formulating the specific intent to injure her. The defendant chose, however, to pursue a different trial strategy. She chose to maintain that she did not strike Laura and that it was her husband who injured the child. The fact that the defendant might have suffered from the battered woman syndrome, and that the syndrome might have impaired the defendant's ability to form the required specific intent, cannot be claimed to create a substantial risk of a miscarriage of justice where it is not relevant to the defendant's chosen trial strategy. Counsel may not try a case on one theory of law, and then obtain appellate review on another theory which was not advanced at trial. *Commonwealth* v. *Roberts*, 407 Mass. 731, 737 (1990). Appellate review should not be the occasion to convert the "consequences of unsuccessful trial tactics and strategy into alleged errors by the judge." *Commonwealth* v. *Johnson*, 374 Mass. 453, 465 (1978).

In *Commonwealth* v. *Moore*, 25 Mass. App. Ct. 63 (1987), the defendant was convicted of murdering her former boy friend. The defendant claimed on appeal that the judge erred in not admitting evidence of battered woman syndrome. The Appeals Court concluded that, since the defendant denied killing the victim, evidence on the battered woman syndrome and its possible effect on her belief that she was in imminent danger of death or serious injury at the time of the incident was irrelevant. *Id.* at 68-69.[12] Similarly, since the defendant's strategy in the case at bar was to convince the jury that her husband was solely responsible for the child's injuries, and no objection was made to the charge given, she cannot convincingly claim a miscarriage of justice arising from the judge's failure to instruct the jury that the battered woman syndrome should be taken into consideration

---

[12]The Appeals Court assumed without deciding that testimony on battered woman syndrome is admissible in Massachusetts. *Id.* at 66-67.

when determining whether the defendant had the specific intent to injure the child. See *Commonwealth* v. *Fano*, 400 Mass. 296, 306 (1987); *Commonwealth* v. *Johnson, supra.*[13]

2. *Extraneous influence on the jury.* On August 23, 1989, the defendant filed a motion for a new trial based on an alleged improper communication during her trial between a member of the jury and his brother Thomas Witkos, the recreation director at the Hampshire County jail, the facility where the defendant was held prior to and during her trial. A hearing on the motion was held on May 18, 1990, before the trial judge. The defendant testified that, several months before the trial, Witkos asked her why the prosecutor was withdrawing a plea bargain offer. According to the defendant, she told Witkos that the plea bargain had been withdrawn because of statements made by the child to a psychologist which had incriminated the defendant. The defendant also testified that, during the trial, Witkos informed her that his brother was a juror on her case. She claimed that he told the defendant that his brother had questions about an exhibit admitted in evidence.[14] The defendant refused to answer Witkos's questions.

Witkos also testified at the hearing. He stated that he did not find out that his brother had been a juror in the defendant's trial until ten days after the completion of the trial. Witkos's brother was an alternate juror who did not participate in the deliberations. Witkos denied that he spoke to the defendant during the trial.

The judge denied the motion. The judge concluded: "I find no facts indicating any impermissible contact took place with any juror nor did the jury receive any information improp-

---

[13]We do not decide whether, if the defendant had admitted striking the child, it would have been error for the judge not to instruct the jury that they could take the battered woman syndrome into consideration when determining whether the defendant had the specific intent to commit mayhem on the child.

[14]The exhibit apparently consisted of a written statement given by the defendant to the police during their investigation.

erly." The defendant argues that the judge erred in denying the motion without interviewing the jurors.

In *Commonwealth* v. *Fidler*, 377 Mass. 192, 197-198 (1979), we stated that, under certain limited circumstances, it is proper for a judge to conduct a postverdict inquiry on whether extraneous influences affected the jury's verdict. The judge "has broad discretion 'to determine what manner of hearing, *if any*, is warranted'. . . . No duty to investigate arises unless the court finds some suggestion or showing that extraneous matters were brought into the jury's deliberations. . . . The party seeking judicial investigation must make a colorable showing that an extrinsic influence may have had an impact upon the jury's impartiality." (Citations omitted.) *Commonwealth* v. *Dixon*, 395 Mass. 149, 151-152 (1985), *S.C.*, 25 Mass. App. Ct. 678 (1988), and cases cited.

It was for the judge to evaluate the credibility of the witnesses who testified at the hearing. The judge found Witkos, and not the defendant, credible. The defendant failed to make any showing that an extraneous influence may have affected the jury's impartiality. The judge did not abuse his discretion in denying the motion for a new trial without interviewing the jurors.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*