NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-386                                            Appeals Court

COMMONWEALTH  vs.  DONNA SILVIA.

No. 19-P-386.

Bristol.     January 3, 2020. - March 10, 2020.

Present:  Hanlon, Blake, & Hand, JJ.


Mayhem.  Joint Enterprise.  Evidence, Intent, Joint
    venturer.  Practice, Criminal, Motion to suppress.  Search
    and Seizure, Affidavit, Probable cause.



    Indictments found and returned in the Superior Court
Department on May 18, 2012.

    A pretrial motion to suppress evidence was heard by D.
Lloyd Macdonald, J., and the cases were tried before E. Susan
Garsh, J.


    Dana Alan Curhan for the defendant.
    Mary E. Lee, Assistant District Attorney, for the
Commonwealth.


    BLAKE, J.  Following a jury trial in the Superior Court,

the defendant, Donna Silvia, was convicted of mayhem, assault

and battery by means of a dangerous weapon causing serious

bodily injury,[1] and intimidation of a witness.[2]  Prior to trial,
the defendant moved to suppress statements that she made to the
police and evidence obtained from the search of a video
surveillance system.  The motions were denied.  Later, however,
in response to the defendant's motion for reconsideration, the
Commonwealth agreed to the suppression of the defendant's
statements that were made during her interview at the police
station, after her involuntary transport to the station without
probable cause.  See Commonwealth v. Melo, 472 Mass. 278, 297-
298 (2015).  On appeal, the defendant contends that the evidence
was insufficient to prove that she engaged in a joint venture to
commit mayhem and that it was error to deny her motion to
suppress the evidence obtained from the surveillance system.[3]  We
affirm.

Background.  In light of the defendant's challenge to the
sufficiency of the evidence, we review the evidence under the
familiar Latimore standard.  Commonwealth v. Latimore, 378 Mass.

---

[1] The judge dismissed the conviction for assault and battery
by means of a dangerous weapon as duplicative of the mayhem
conviction.

[2] The Commonwealth prosecuted the case on the theory that
the defendant was a joint venturer with another person, John
Soares.  Soares was tried separately and convicted.

[3] The defendant's brief makes no argument with respect to
the conviction of intimidation of a witness.

671, 676-677 (1979).  The defendant owned Columbia Towing[4] in Fall River.  The defendant ran the company; she made all of the business decisions and handled all of the money.  The victim had worked for Columbia Towing, driving a tow truck and repairing vehicles, since 2005 or 2006.  During that time, he lived in an apartment owned by the defendant.  The victim considered the defendant and her husband to be "like family."  In March 2012, the defendant's relationship with the victim took an abrupt turn for the worse when the defendant, who for several years had been concerned that money had gone missing from the towing company, accused the victim of stealing $50,000.

Matters rapidly came to a head.  On March 27, 2012, the defendant watched as her husband and James Connors, a part-time employee of Columbia Towing, beat the victim.  During the beating, which took place at Columbia Towing, the defendant questioned the victim about the missing money and demanded that he admit to stealing the money.[5]  The victim denied that he had stolen the money.  Before the victim left, the defendant took the victim's cell phone, truck keys, and bike.

---

[4] We use the term "Columbia Towing" to refer to the company and its physical facilities.

[5] The victim described the beating as getting the "living crap beat out of [him]" and being continually "wailed on."  The victim suffered bruises and injuries to, among other places, his face.

When the victim returned to work the next day, the defendant continued to demand a written confession from him. At around midday, she told the victim to write a confession; he wrote a statement denying that he had stolen the money but suggesting how it could have been stolen. After the defendant read the statement, she demanded that the victim write another letter confessing to stealing the money. At that point, John Soares, a customer of Columbia Towing, entered the building.[6] The victim knew Soares, as he was often at the business and performed some plumbing work there and at other properties owned by the defendant. The victim had never had any prior problems with Soares. When Soares entered the building, he was carrying a bag of tools. Soares first went to the defendant's office and met with the defendant, her husband, and Connors.[7]

Columbia Towing was equipped with a surveillance system that included cameras, monitors, and a digital video recorder (DVR). After Soares arrived, the defendant's husband and Connors moved the surveillance cameras in the garage so that they faced the ceiling.

---

[6] Soares was described as very muscular, weighing between 270 and 280 pounds, and at least six feet, three inches tall.

[7] The side door to Columbia Towing opened into a hallway, on the immediate right was a bathroom, on the left was an entrance to the garage, five feet ahead was the office. There was a bench in the hallway.

While the defendant was meeting in her office with Soares, the victim sat on the bench in the hall, as instructed by the defendant. Soares, who held the bag that he had brought with him, then told the victim to accompany him to the garage. The two entered the garage. Video surveillance recordings from cameras outside the garage showed the defendant, her husband, and Connors leaving the building as Soares led the victim to the garage. In the garage, Soares asked the victim if he had stolen the defendant's money; the victim again denied doing so. Soares responded, "You know why they call me the sandman? . . . Because people go to sleep." Soares removed a set of cutting shears, some wipes, and a propane blow torch from his bag. Soares told the victim to put a towel in his mouth and place his hands on a tool bench. He then instructed the victim to close his eyes. After the victim complied with all of Soares's directives, the victim felt his right pinkie finger being cut and heard a snip. The victim opened his eyes and found that his finger was dangling off his hand by a piece of skin. Soares briefly left the garage. The victim remained where he was; he was in shock and could not believe what had happened.

At some point the defendant had come back into the building and gone to her office. She passed a window that looked into the garage. Soares met the defendant in her office. The video recording, as reflected in the still photographs, shows the

defendant looking through her belongings and handing something to Soares. When Soares returned to the garage, he had a knife in his hand, which the victim had not seen before. Soares used the knife to make the final cut that severed the victim's finger, then he left the garage with something in his hand. The victim wrapped his hand with the towel that had been in his mouth.

After Soares left the garage, he walked into the defendant's office and placed the severed finger on the counter in front of the defendant. Soares then returned to the garage, cleaned the shears with the wipes that he had brought with him, and burned the wipes with the blow torch from his bag.

The defendant entered the garage; in a stern voice, she repeatedly told the victim "to tell the truth." The victim eventually replied, "Fine. Whatever. I did it." The defendant then told the victim to say that he lost his finger in an accident someplace other than at Columbia Towing. At some point after the defendant entered the garage, Soares took his bag and left. Neither Soares nor the defendant requested any medical assistance for the victim and neither preserved the finger for possible reattachment.[8]

---

[8] The victim's finger was never located.

After the defendant left the garage, she returned to her office. Because the victim was cold, he went to the office and asked the defendant for his keys so that he could retrieve a jacket from his truck. The defendant gave him the keys. After the victim retrieved his jacket, he returned to the office, where the defendant, her husband, and Connors were eating Chinese food. Connors then asked the victim to step into the bathroom; after they entered the bathroom, the victim heard the police yelling his name.

When the victim came out of the bathroom, the police noticed that the victim had facial injuries and that his right hand was wrapped in a blood-soaked rag. After some prodding by the police, the victim removed the rag and the police saw that the victim's right pinkie finger had been cut off with a very smooth and clean cut. They described the victim as shocked, nervous, scared, and defeated.

The defendant focused her comments to the police -- not on the victim's condition -- but on the missing money. She told the police that the victim had stolen money from her business and they had worked out a payment plan; she did not want to press charges, she just wanted the money back. She did not mention the victim's finger.

After the victim was transported to a hospital, the police "froze" the scene at Columbia Towing to conduct an

investigation.  They noticed that the cameras inside the garage were pointed to the ceiling and the video monitoring system appeared to be missing some of its recording components.  One of the police officers at the scene saw electrical components and a black rectangular box that appeared to be a DVR inside a red Ford Expedition (SUV) parked across the street from Columbia Towing.  Because the police believed that these items were the equipment missing from Columbia Towing, they secured and towed the SUV from the scene.  The DVR contained surveillance video recordings from Columbia Towing; the recordings were admitted in evidence, along with still photographs from those recordings.[9] The surveillance system did not capture what occurred in the garage.

Discussion.  1.  Sufficiency of evidence.  The defendant contends that the evidence was insufficient to prove that she knowingly participated in a joint venture with Soares to commit mayhem.  The elements of mayhem are set forth in G. L. c. 265, § 14, which states:  "Whoever, with malicious intent to maim or disfigure . . . cuts off or disables a limb or member, of another person, and whoever is privy to such intent, or is

---

[9] The defendant challenges the admission of the video surveillance evidence as discussed, infra.  However, sufficiency is determined in light of the evidence admitted at trial, regardless of the propriety of that admission.  Commonwealth v. Farnsworth, 76 Mass. App. Ct. 87, 98 (2010).

present and aids in the commission of such crime," is guilty of mayhem. The Commonwealth proceeded under a theory of joint venture liability and therefore was required to prove "that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." Commonwealth v. Zanetti, 454 Mass. 449, 466 (2009). Mere presence at the scene of the crime is insufficient to prove a defendant's knowing participation, even if "supplemented by evidence that the defendant 'knew about [the crime] in advance.'" Commonwealth v. Gonzalez, 475 Mass. 396, 414 (2016), quoting Zanetti, supra at 470 (Appendix). "Rather, there must be some additional proof that the defendant 'consciously . . . act[ed] together [with the principals] before or during the crime with the intent of making the crime succeed.'" Gonzalez, supra, quoting Zanetti, supra. The intent element may be established "by direct or inferential proof that the assault was intentional, unjustified, and made with the reasonable appreciation on the assailant's part that a disabling or disfiguring injury would result." Commonwealth v. McPherson, 74 Mass. App. Ct. 125, 128 (2009), quoting Commonwealth v. Lazarovich, 28 Mass. App. Ct. 147, 154 (1989).

The defendant's shared intent to commit mayhem is rooted in the relationship between the victim, Soares, and the defendant. The three were not strangers. The defendant had authority over

both the victim and Soares.  She was the victim's employer and landlord, and she was Soares's employer.[10]  The defendant's recruitment of Soares to increase the pressure on the victim to confirm her suspicion that the victim had stolen her money was in keeping with her past conduct:  the day before Soares cut off the victim's finger, the defendant had watched as her husband and another employee tried to beat a confession out of the victim.  When that gambit proved unsuccessful, she called on Soares, an imposing figure, to resolve the missing money issue.  Soares entered the garage with a bag containing the tools that were ultimately used to commit the crime and destroy evidence of the crime.  The preplanned, calculated use of a weapon, without warning, on a defenseless person supports an inference of intent to maim or disfigure.  See McPherson, 74 Mass. App. Ct. at 128 (hitting unsuspecting victim in head with baseball bat sufficed to prove intent to maim or disfigure).  The defendant's deliberate choice to absent herself during the assault, despite being present at the beating the previous night, supports the inference that she knew exactly what Soares planned to do.

Moreover, the crime occurred at the defendant's business, and she and others caused the surveillance system to be altered just prior to the assault; it is fair to infer their purpose was

---

[10] The victim and Soares knew each other based on their respective business relationships with the defendant.

to avoid capturing the attack. The defendant told Soares about the missing money and allowed him to amputate the victim's finger in furtherance of her mission to secure a confession. It is evident that Soares knew his purpose was to extract a confession from the victim by all available means, and Soares's knowledge that the defendant blamed the victim for the missing money is evidence that the defendant "knowingly participated in the commission of the [crime] charged, [along with Soares], with the intent required for that offense." Zanetti, 454 Mass. at 466. Likewise, it is fair to infer from the evidence that when Soares was unable to amputate the finger fully, the defendant gave him the knife that he used to make the final cut; and that after the finger was severed, Soares delivered the victim's finger to the defendant in her office, thus demonstrating her active participation in the mayhem. As a result, the Commonwealth proved that the defendant collaborated with Soares not only before, but during and after the amputation. "[T]here is no need to prove an anticipatory compact between the parties to establish joint venture . . . if, at the climactic moment[,] the parties consciously acted together in carrying out the criminal endeavor." Commonwealth v. McCray, 93 Mass. App. Ct. 835, 843 (2018), quoting Commonwealth v. Sexton, 425 Mass. 146, 152 (1997). Contrast Commonwealth v. Hogan, 379 Mass. 190, 192-193 (1979) (evidence was insufficient to prove joint venture for

mayhem where defendant waited in car while others entered victim's home to attack him).

Following the assault, the defendant tried to cover up the crime by insisting that the victim create a story to explain that the amputation was an accident and did not happen at Columbia Towing. This constitutes evidence of the defendant's consciousness of guilt, further proving the defendant acted in concert with Soares. See Commonwealth v. Javier, 481 Mass. 268, 283-284 (2019). See also Commonwealth v. Vick, 454 Mass. 418, 423-424 (2009), quoting Commonwealth v. Stuckich, 450 Mass. 449, 453 (2008) ("Consciousness of guilt instructions are permissible when there is an 'inference of guilt that may be drawn from evidence of . . . concealment, or similar acts,' such as . . . destruction or concealment of evidence, or bribing or threatening a witness").

The defendant relies on Gonzalez, 475 Mass. 396, to support her claim of insufficient evidence. In Gonzalez, the issue was whether the defendant knew of and shared the coventurers' intent to kill. See id. at 396-397. In concluding that the evidence of the defendant's intent was insufficient, the court focused on the lack of proof beyond a reasonable doubt of the defendant's presence at the crime, aid to the other defendants in committing the crime, and communication with the other defendants around the time that the crime was committed. See id. at 407-413.

By contrast, here, the evidence was that the defendant took the victim's keys and phone the night before the assault, which ensured that he would have to return to Columbia Towing. She was present when Soares arrived, and she met with Soares in her office immediately before the assault. In addition, the jury could reasonably infer that the defendant told Soares that the victim had stolen money from her, that the defendant gave Soares the knife that he used to finish severing the finger, and that Soares showed the defendant the severed finger. Moreover, the evidence showed that shortly after Soares had finished severing the victim's finger, the defendant continued to try to extract a confession from the victim and told the victim to say that the finger was amputated during an accident that did not happen at Columbia Towing. We are satisfied that the evidence was sufficient.

2. Motion to suppress. The defendant claims it was error to deny her motion to suppress the evidence obtained from the DVR because the search warrant affidavit failed to establish probable cause and contained statements of the defendant that were suppressed. When considering the sufficiency of a warrant application, our review "begins and ends with the 'four corners of the affidavit.'" Commonwealth v. Cavitt, 460 Mass. 617, 626 (2011), quoting Commonwealth v. O'Day, 440 Mass. 296, 297 (2003). "In determining whether an affidavit justifies a

finding of probable cause, the affidavit is considered as a whole and in a commonsense and realistic fashion . . . ."  Cavitt, supra.  The affidavit should not be "parsed, severed, and subjected to hypercritical analysis."  Commonwealth v. Donahue, 430 Mass. 710, 712 (2000), quoting Commonwealth v. Blake, 413 Mass. 823, 827 (1992).  "We evaluate whether the affidavit underlying the warrant application satisfies the probable cause standard required by art. 14 [of the Massachusetts Declaration of Rights] de novo."  Commonwealth v. Robertson, 480 Mass. 383, 386 (2018).

As a preliminary matter, at oral argument the defendant conceded that, while her statements had been suppressed, those of her husband were not.  Further, the defendant does not have "target standing" to challenge the statements made by her husband.  See Commonwealth v. Santiago, 470 Mass. 574, 577-578 (2015) ("target standing permits a criminal defendant . . . to assert that a violation of the [Constitutional] rights of a third party entitled [the defendant] to have evidence suppressed at his trial" [quotations and citation omitted]).  Although the Supreme Judicial Court has cautioned that distinctly egregious conduct by the police might warrant the reliance in a suppression hearing on a violation of a third party's constitutional rights, id. at 578, the defendant here does not allege that such conduct occurred, nor did it occur.  Thus, the

defendant's husband's statements to the police were properly considered by the motion judge.  Because the affidavit contained statements of the defendant that were subsequently suppressed, we consider whether the affidavit was supported by probable cause after the defendant's statements are excised from the affidavit.  See Commonwealth v. Westerman, 414 Mass. 688, 691-692 (1993).

The affidavit set forth the following information.  On March 28, 2012, at about 4:30 P.M., the police discovered the victim, bleeding, and with his finger amputated, at Columbia Towing.  The police obtained information that the victim was assaulted and maimed that day.  The defendant's husband told the police that the victim recently had taken responsibility for stealing over $50,000 from Columbia Towing.  The defendant's husband also told the police that Columbia Towing was equipped with a video surveillance system, and that the surveillance system was present when Columbia Towing opened that day.  On the day of the assault, the police saw a monitor and cameras at the scene, but they did not see a recording device for the surveillance system.  Additionally, they saw a DVR in a nearby SUV, which was not owned by the defendant.[11]  Each of these

---

[11] The motion judge found that the defendant did not have standing to challenge the search and seizure of the SUV, but did have standing to challenge the search of the DVR.  The warrantless seizure of the SUV also was found proper under the

assertions had a source independent from the statements made by the defendant and, together, were sufficient to establish probable cause that the DVR contained evidence of a crime. See Commonwealth v. Keown, 478 Mass. 232, 238 (2017), cert. denied, 138 S. Ct. 1028 (2018).  For that reason, none of the defendant's statements that were suppressed were necessary to establish probable cause.  There was no error in denying the motion to suppress.

Judgments affirmed.

---

automobile exception.  See Commonwealth v. Motta, 424 Mass. 117, 124 (1997).  The defendant does not challenge any of these findings on appeal.