NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11731

COMMONWEALTH  vs.  CAURIS GONZALEZ.


Essex.     December 11, 2015. - September 6, 2016.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.[1]


Homicide.  Joint Enterprise.  Evidence, Joint venturer, Intent.
    Intent.  Practice, Criminal, Capital case.



Indictment found and returned in the Superior Court
Department on June 29, 2011.

The case was tried before Mary K. Ames, J.


Robert F. Shaw, Jr., for the defendant.
David F. O'Sullivan, Assistant District Attorney, for the
Commonwealth.


LENK, J.  Shortly before 6 P.M. on January 10, 2009, Robert

Gonzalez was shot and killed while sitting in his minivan near

an intersection in Lawrence.  The shooting was carried out by

four people who, seconds before, had been dropped off across the

intersection by someone driving a Dodge Caravan minivan.  In

---

[1] Justice Cordy participated in the deliberation on this
case and authored his separate opinion prior to his retirement.

June, 2011, the defendant was indicted by an Essex County grand jury on one count of murder in the first degree based on evidence that she had been the driver of the Caravan.  After a jury trial in the Superior Court, the defendant was convicted as a joint venturer of murder in the first degree on a theory of deliberate premeditation.

On appeal, the defendant claims that the trial judge erred in denying her motion for a required finding of not guilty.  In particular, the defendant contends that the evidence was insufficient to allow a rational juror to conclude, beyond a reasonable doubt, that she was the driver of the Dodge Caravan, or that she knew of and shared the coventurers' intent to kill the victim.  The defendant also claims, among other things, that the judge erred by allowing the admission of (a) the opinion of one of the Commonwealth's witnesses interpreting cellular site location information (CSLI) generated by the defendant's cellular telephone, and (b) a video recording comparing still photographs from surveillance footage of the Dodge Caravan that had transported the four passengers involved in the shooting with the Dodge Caravan owned by the defendant's mother.  The defendant contends also that her trial counsel was ineffective for failing to object to the admission of an audio recording of statements she made to police shortly after the killing.

We conclude that the motion for a required finding of not guilty should have been granted. While the jury could have concluded, on this evidence, that the defendant was in some way involved in the shooting, or that it was more likely than not that she was the driver, the evidence was insufficient to allow a jury to draw this conclusion beyond a reasonable doubt. Further, even if the jury could have found that the defendant transported the coventurers to the scene, the evidence did not allow the jury to conclude, beyond a reasonable doubt, that she knew of or shared the coventurers' lethal intent, as is required for a conviction of deliberately premeditated murder committed by way of joint venture. Because we reverse the conviction on this basis, we do not address the defendant's other claims.

1. Background. a. Background information. In late 2008, the defendant, then nineteen years old and living with her mother in Methuen, sold a Honda Civic automobile to the victim, Robert Gonzalez.[2] The victim made a partial payment for the vehicle, but, as of January, 2009, there was an outstanding balance.[3]

---

[2] The victim and the defendant are not related.

[3] The Commonwealth argued at trial, in both its opening statement and closing argument, that the amount owed was $100. While the evidence does not indicate the exact amount of the remaining balance, the defendant does not contest this amount.

On the evening of Friday, January 9, 2009, the defendant and her boy friend, Joel Javier, attended a party hosted by one of Javier's friends at an apartment on Essex Street in Lawrence. Also at the party was Yoshio Stackermann, a friend of Javier. The defendant had driven both Stackermann and Javier to the party in her mother's vehicle, a 2000 Dodge Caravan.[4] The defendant, Javier, and Stackermann left the party together[5] and drove away in the Caravan at approximately 11 or 11:30 P.M., with plans to get something to eat at a nearby fast food restaurant and then return to the party. They did not go directly to the restaurant, and they did not return to the party.[6]

A few hours later, at 2 A.M. on Saturday, January 10, 2009, the defendant and Javier (but not Stackermann) were in the Caravan near the same fast food restaurant they had planned to visit earlier. The defendant was driving. The defendant

---

[4] The defendant shared use of this vehicle with her mother, in whose name it was insured and who apparently used it to drive to and from work.

[5] At some point earlier, Javier left the party without the defendant and drove her minivan to a liquor store; he returned shortly thereafter and ultimately left the party together with the defendant and Stackermann.

[6] It is not clear from the record where they did go.

spotted the victim's vehicle, also a Dodge Caravan.[7]  She called the victim from her cellular telephone, apparently to ask about the money she was owed.  The victim did not answer.  The victim then called Javier's cellular telephone and ended up speaking to the defendant.  The victim and the defendant had a "very loud" conversation.

A "couple of minutes" later, shortly after 2 A.M., the defendant concluded the conversation with the victim and entered the drive-through lane at the fast food restaurant.  As she and Javier waited for their food, the victim drove by in his Caravan and began "yelling" in the direction of the defendant's vehicle.  Javier shouted back.

The victim drove around the corner and parked in a nearby parking lot.  He got out of his minivan, along with three male passengers, and walked toward the restaurant.  They saw Javier standing outside the vehicle and the defendant sitting inside it.  The victim and Javier walked towards each other, shouting, until they were "[a]bout an arm length" apart.  Javier pulled out a knife.  He was "not waving it towards" the victim, but "just letting it [be] known that he had a knife on him."  The victim punched Javier in the face, knocking out one of his teeth

---

[7] The victim had sold the Honda Civic, which he had purchased from the defendant, and used the money to buy the Caravan.

and causing him to drop the knife.  Javier spit out the tooth, and one of the three men with the victim picked it up.

The victim and his companions turned and walked back toward the victim's minivan.  Javier followed behind saying, "[O]h, you knocked my fucking tooth out, you fucking really going to knock -- you're really going to do that shit?"  When the victim and his companions reached their vehicle, Javier, still following behind, "threw his phone, trying to hit" the victim with it.  The device broke and was left on the ground.[8]

The defendant, who had remained in the driver's seat of her mother's Caravan, drove to Javier and told him to get in.  Javier refused.  The defendant stepped out of the Caravan.  Javier then said that the victim was "not going to stay like that," and entered the vehicle on the driver's side.  The defendant got in on the passenger's side, and the two drove off.  The defendant "dropped off" Javier at his house in Lawrence, where he lived with his parents, and the defendant returned to her house.  The two talked on the telephone throughout the night until about "[six] something in the morning."

At approximately 6:45 A.M., the defendant drove her mother to work.  The defendant then went to Javier's house, where the two slept until noon.  They drove in the Caravan to a pharmacy, where they bought ointment for Javier's swollen mouth.  On their

---

[8] Javier did not return to retrieve it.

return, as the defendant was driving and Javier was sitting in the rear passenger seat, the defendant saw the victim's Caravan. According to the defendant's statement to police, which was in evidence at trial, the victim "came . . . to hit [her] head on," she swerved to avoid him, and the victim was "saying . . . a whole bunch of stuff."[9]

The defendant and Javier drove back to Javier's house "between one or two" P.M.  As the two got out of the Caravan, they saw the victim's vehicle approaching.  The defendant told Javier to drive off in the Caravan, which Javier did.  After Javier left, the defendant knocked on the front door, and Javier's mother answered.  The defendant told her that "there was a man outside who wanted to beat up Joel."  Javier's mother stepped outside and saw the victim across the street standing near his vehicle.  He was laughing, saying that "he was carrying [Javier's] tooth" and that he would sell it back "for a hundred bucks."  The victim left a few minutes later, and Javier, driving the Caravan, returned sometime thereafter.[10]

---

[9] The defendant said in her written statement to police that she could not hear what the victim was saying because the driver's side window was shut.

[10] The victim arrived at his house around 4 P.M., and left shortly thereafter to run errands for his girlfriend.

At approximately 1:40 P.M., the defendant called her brother's girl friend, Ashley Calixto, to say that she would come by later to visit Calixto at her house in Methuen.

The evidence of what occurred between that point and 6 P.M., the approximate time of the shooting, consists primarily of cellular telephone records and accompanying CSLI.[11],[12] We turn first to the period between 2 P.M. and approximately 5:30 P.M. In that interval, eight calls were made between cellular telephone numbers belonging to three of Javier's friends -- Stackermann, Thomas Castro, and Francis Wyatt -- all of whom

---

[11] In a written statement provided to police, the defendant stated that, at approximately 2 P.M., she drove Javier's mother to work and then spent most of the rest of the afternoon (until her visit to Calixto, her brother's girl friend) in Javier's house, leaving only to pick up certain items from her house and her father's business. Javier's mother testified that the defendant took her to work at 3:30 P.M.

[12] According to an employee of wireless telephone company T-Mobile, Raymond McDonald, called by the Commonwealth as a witness, a cellular site is a tower-like transmitter that sends data to, and receives data from, cellular telephones. The concentration of cell sites is heavier in urban areas than in rural ones. The "average" cellular site covers about "two miles," although it "could be a lot further, depending on a lot of factors." "Typically, it[ is] the closest cell site [to the device] that will handle [a] signal" sent to or received from that device. It is "not always the closest," however, "it's the tower that has the strongest signal at the time." Cellular site location information refers to a log kept by the telephone company concerning the cellular sites that a particular cellular telephone connected to when it made and received calls. See Commonwealth v. Augustine, 467 Mass. 230, 231 n.1 (2014), S.C., 472 Mass. 448 (2015).

worked with Javier at a local snow-shoveling business.[13]  The telephone records also show that, during this period, six calls were made between the defendant's number and Stackermann's number, and two between her number and Castro's number.[14]

We turn next to the interval between shortly after 5:30 P.M. and the shooting.  At 5:41 P.M., a call was made from Castro's number to Stackermann's number.  The call was transmitted, on both the sending and receiving ends, through wireless telephone company T-Mobile cellular site 4160, located approximately nine-tenths of a mile from the intersection in Lawrence where the shooting took place.  At 5:45 P.M., a call was made from Stackermann's number to Wyatt's number; it was transmitted through T-Mobile cellular site 4422, located approximately eight-tenths of a mile from that intersection.[15]  At 5:51 P.M., a call to the defendant's number was transmitted

_____

[13] Two were between Stackermann and Wyatt, five between Stackermann and Castro, and one between Castro and Wyatt.

[14] Three of the Commonwealth's witnesses testified that, generally and at various points on the day of the shooting, Javier made and received calls using the defendant's cellular telephone.  With regard to the calls in question here, there was no evidence whether the defendant was the speaker.

[15] In one place in its brief, the Commonwealth implies that tower 4422 is the T-Mobile cellular site closest to the intersection where the shooting took place.  According to the record, however, as the Commonwealth acknowledges elsewhere in its brief, T-Mobile cellular site 4449, located approximately four-tenths of a mile from the intersection, is closer.

from T-Mobile cellular site 4422.[16]  Between 5:45 P.M. and 6:01 P.M., there were no outgoing calls from the numbers belonging to the defendant, Castro, Stackermann, and Wyatt.

b. The shooting.  The events immediately surrounding the shooting, between 5:57 P.M. and 5:58 P.M., were recorded by four surveillance cameras[17] mounted on a house near the intersection of Haverhill Street and Hampton Street in Lawrence.[18]  The cameras were on the northern side of the intersection, while the shooting took place on the southern side.  The intersection itself was less than two miles from the defendant's house, about one and one-half miles from Javier's house, and approximately one mile from the automobile dealership owned by the defendant's father.

At 5:57 P.M., the victim's Dodge Caravan drove north on Hampton Street, parking on that street just before its intersection with Haverhill Street.  The victim was driving.  There were two passengers in the vehicle, one in the front

---

[16] Twenty-three other calls from the defendant's number were transmitted through T-Mobile cellular site 4422 on the day of the shooting.  It is not claimed that the defendant was at the shooting scene when these other calls were made.

[17] The cameras were infrared devices with no sound recording capability, whose footage was "choppy" and of insufficient quality to identify facial features or license plate numbers.

[18] Hampton Street, a side street, runs roughly north-south. It intersects at its northern end with Haverhill Street, a main thoroughfare, which runs roughly east-west.

passenger's seat and one in the rear seat.  The passenger in the front seat got out of the vehicle and walked into a nearby building.  The victim and the other passenger remained in the minivan.

Approximately twenty seconds later, another Dodge Caravan (suspect vehicle) came into the view of the cameras heading west on Haverhill Street towards the intersection.  It stopped near the intersection.  Four individuals got out and immediately walked south across the street toward the victim's minivan, stopping traffic as they did so.[19]  Two of the individuals headed to the vehicle's right side, while two headed to the left.  The individuals reached the rear of the vehicle.  The vehicle lurched forward and then slid towards the side of the road.  A pedestrian in the foreground ducked out of the way, apparently hearing shots.  Subsequent investigation revealed that at least fifteen shots were fired from behind the vehicle by two different handguns, and that two of those shots hit the victim in the back.[20]  The four individuals fled, heading south away from Haverhill Street.  This entire course of events ended

---

[19] The video does not show the facial features of the suspects, or whether weapons were displayed.

[20] The passenger emerged from the vehicle after the shooting, apparently uninjured, and tended to the victim until police arrived.

approximately thirty seconds after the individuals were dropped off.

Immediately after dropping off the four individuals, the suspect vehicle drove straight (west) on Haverhill Street for several feet and then turned right (north) onto a side street. A few moments later, it turned around and drove back to Haverhill Street. There, it turned right (west) and drove out of the view of the cameras.

One of the victim's companions called 911, and police were dispatched at around 5:59 P.M. The responding officer found the victim with wounds to his back and side. He was taken to a hospital, where he was pronounced dead.

At around 6:01 P.M., two calls were made from the defendant's number to Castro's number; the calls were transmitted through T-Mobile cellular site 4449, the one closest to the scene of the crime.[21] Also at 6:01 P.M., a call was made from Castro's number to a local taxicab service; the caller asked to be picked up on Warren Street, two blocks west of the shooting scene. Between 6:04 P.M. and 6:06 P.M., three calls were made from the defendant's number (to her brother's number and to that of Calixto, his girl friend); all were transmitted

_____

[21] Telephone records show that six other calls to and from the defendant's number were transmitted through T-Mobile cellular site 4449 on the day of the shooting. These other calls took place at times when it is not claimed that the defendant was at the crime scene.

through T-Mobile cellular site 4160, located less than one mile from the scene of the shooting.

At "6:15 -- 20-ish," the defendant and Javier arrived at Calixto's house in her mother's Dodge Caravan; there was no evidence who was driving.[22]  Calixto, who had undergone surgery a week before, gave Javier a Percocet pill for pain in his mouth, which was "red and sore."  The defendant stayed until 6:45 P.M., when she left to pick up her mother at work.  She returned there later that evening to pick up Javier.

Sometime that evening, Stackermann arrived unannounced at the house of his friend Alberto Medina.  Medina's wife answered the door and, in response to his inquiry, told Stackermann that Medina was not home.  Four days later, Medina was arrested by Lawrence police on an unrelated charge.  Following his arrest, he offered to show police a gun that he had in his house.  Police took possession of the gun.  A State trooper test-fired the gun and compared the resulting bullet casings to casings found at the scene of the shooting.  He concluded to "a reasonable degree of ballistic certainty" that six of the bullet casings from the shooting scene came from Medina's gun.  The gun

---

[22] The defendant told police that she had arrived at Calixto's house about fifteen to twenty minutes earlier, around 6 P.M.  McDonald, the T-Mobile witness, testified that, had she actually been at Calixto's house by then, "one would expect [her] call[s] to hit" other cellular sites closer to Calixto's address in Methuen.

also was examined for fingerprints and traces of deoxyribonucleic acid (DNA). A fingerprint belonging to Medina was recovered, as was one belonging to an unknown individual.

c. Investigation. By January 13, 2009, three days after the shooting, investigating officers learned that Javier had "had some sort of a disagreement with the victim." Detectives went to Javier's house to interview him. Javier's father answered the door, told them that Javier was not at home, and then telephoned Javier. Javier arrived a few minutes later with the defendant. The detectives asked both Javier and the defendant if they would agree to speak with officers at the police station, and each agreed. They were interviewed separately.

The defendant waived her Miranda rights and consented to the interview being recorded. During the interview, detectives laid out their theory of the case and accused the defendant of having driven the coventurers to the scene of the crime; the defendant denied the accusations. She stated that she and Javier were "together all day." When the detectives asked if she had been the only one driving her mother's Dodge Caravan that day, she responded "Mmm hmm."[23] When they asked her who of Javier's friends might have been connected to the shooting, she

---

[23] The defendant also mentioned that Javier had driven the minivan at one point, shortly before the victim offered to sell back Javier's tooth.

answered, "I have no idea . . . I don't know any of his other friends." She also stated that, between 5:30 and 6 P.M. on January 10, 2009, she "was probably on my way to [Calixto's] or in the process of getting there or something."

Finally, the defendant said that, on the night of the shooting, at about 10 P.M., she went with Javier, as well his mother and sister, to her aunt's house and

> "just asked [the aunt] for what we should do since people are saying that [Javier] was there when he wasn't. She just said to . . . write everything you did on a piece of paper so you . . . won't forget if questions are asked after."[24]

The detectives asked the defendant if she had in fact written everything down and whether she had the statement with her. The defendant responded that she had written everything down, that she had a copy with her, and that the police "can keep it." In this written statement, the defendant claimed that she "got to [Calixto's] house a little before 6:00 [P.M.]" The interview ended after approximately one hour.

On January 17, 2009, police seized the Dodge Caravan, which was parked at the defendant's mother's workplace. While searching the vehicle pursuant to a warrant, they found receipts belonging to the defendant and a paystub belonging to Javier.

---

[24] The defendant explained that she asked her aunt for advice because her "husband's a cop and she studies the law." This was redacted, over the defendant's objection, from the statement presented at trial.

They also conducted forensic testing, but did not find "any evidence," such as fingerprints, fibers, or DNA, "link[ing]" Stackermann, Castro, or Wyatt to the vehicle.

On January 26, 2009, one and one-half weeks later, the defendant and Javier traveled together to the Dominican Republic. The purpose of the trip was to allow Javier to have his tooth fixed at low cost. The defendant returned a month later, in February, 2009. Javier returned in September, 2009.

On June 29, 2011, an Essex County grand jury returned an indictment against the defendant charging her with murder in the first degree.

d. <u>Trial</u>. Trial was held in the Superior Court from July 15 through August 2, 2013. The Commonwealth proceeded on a theory of deliberate premeditation, arguing that the defendant had aided the principals -- Javier, Stackermann, Castro, and Wyatt -- by driving them to the scene of the shooting while knowing of and sharing their lethal intent.[25]

On the fifth day of trial, the Commonwealth called Peter Smith, a civilian employee of the Federal Bureau of Investigation's forensic audio, video, and image analysis Unit.

---

[25] Castro was tried separately in April, 2013, and acquitted. Javier's first trial, in June, 2013, resulted in a hung jury. He was convicted, in August, 2013, following a second trial, of murder in the first degree. Stackermann also was tried in June, 2013, and found guilty of murder in the second degree. The charges against Wyatt were dropped.

Smith analyzed images of the suspect vehicle from the surveillance video. While he could not determine whether the suspect vehicle was the one owned by the defendant's mother, agreeing when asked that the vehicle seen in the video recording "might be the same vehicle and it might not be the same vehicle," he did conclude that the suspect vehicle was a Dodge Caravan.[26] Without objection, the jury were shown a video recording created by Smith that superimposed a photograph of the suspect vehicle on a photograph of the defendant's mother's Caravan, "fad[ing] back and forth from the [suspect vehicle] to the [defendant's vehicle]."

On the eighth day of trial, the Commonwealth called Raymond McDonald, a manager at T-Mobile's law enforcement relations group. On the basis of his testimony as keeper of the records, certain T-Mobile cellular telephone records were introduced in evidence. McDonald also provided technical background on how CSLI data are generated and stored, and opined over objection as to the meaning of certain CSLI data from the defendant's cellular telephone.

In particular, McDonald opined that "[t]ypically, it[ is] the closest cell[ular] site [to a device] that will handle [a] signal" sent to or received from that device. Based on this, he

---

[26] He did not state whether the suspect Caravan, like the Caravan owned by the defendant's mother, was from model year 2000.

concluded, over objection, that a cellular telephone call made from Calixto's address "would not reach [T-Mobile cellular site] 4449[]," which transmitted the two calls to Castro's number from the defendant's number in the minutes after the shooting. The defendant moved unsuccessfully to strike the latter testimony. On cross-examination, the defendant elicited that McDonald did not have engineering training or experience, and that, while McDonald knew that "there are numerous factors that go into what [cellular] site" a particular call will use,[27] he did not "have any information about [the effect those factors may have had] in this case."

The next day, the Commonwealth played a recording of the defendant's police interview for the jury. The recording was presented without objection, with both parties agreeing to certain redactions. The judge had expressed some concern about parts of the recording at a hearing the day before the statement was introduced. Defense counsel said that he had made a tactical decision to have police accusations and denials admitted in conjunction with the defendant's own words. The redacted version of the defendant's statement, which was played to the jury, included the detectives' theory of the case, their

---

[27] These factors include the "power output" of the cellular site, "topography," the presence of "manmade structures" between the device and cellular site, "traffic on the particular cell site," "the maintenance status of the particular sites," and the "capacity of the phone" making or receiving the call.

statements accusing the defendant of involvement in the shooting, and the defendant's denials of those accusations.

After the close of the Commonwealth's case, the defendant moved for a required finding of not guilty. The motion was denied. The defendant renewed the motion after the close of all the evidence, and it was again denied. On August 2, 2013, the jury found the defendant guilty of murder in the first degree.[28]

2. Discussion. Under the theory of murder presented at trial, the Commonwealth was required to prove that the defendant intentionally caused the death of the victim "with deliberate premeditation . . . after a period of reflection." Model Jury Instructions on Homicide 37 (2013). See Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). Because the Commonwealth did not contend that the defendant herself carried out the killing, but only that she aided the coventurers, see G. L. c. 274, § 2 ("aid[ing]" punished like act of "principal felon"), it was the Commonwealth's burden to show that the defendant (a) "participated in the commission of the crime charged," (b) did so "knowingly," and (c) "shared the required criminal intent" (citation omitted). Commonwealth v. Britt, 465 Mass. 87, 100-101 (2013). In the circumstances here, this required a

---

[28] The defendant did not file a motion for a new trial pursuant to Mass. R. Crim. P. 30(b), as appearing in 435 Mass. 1501 (2001).

showing that the defendant was the driver of the suspect vehicle, that she knew her passengers intended to kill the victim, and that she shared this intent.

In evaluating whether the evidence at trial was sufficient to support these elements, we "view the evidence presented in the Commonwealth's case-in-chief in the light most favorable to the Commonwealth and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. Simpkins, 470 Mass. 458, 461 (2015), citing Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). "[C]ircumstantial evidence is sufficient to establish guilt beyond a reasonable doubt," Commonwealth v. Miranda, 458 Mass. 100, 113 (2010), cert. denied, 132 S. Ct. 548 (2011), S.C., 474 Mass. 1008 (2016), and inferences drawn from such evidence "need only be reasonable and possible; [they] need not be necessary or inescapable." Commonwealth v. Beckett, 373 Mass. 329, 341 (1977). Nonetheless, "it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt." Commonwealth v. Latimore, supra at 677-678. In addition, "[n]o[] . . . conviction [may] rest upon the piling of inference upon inference or conjecture and

speculation" (quotations and citation omitted). Commonwealth v. Swafford, 441 Mass. 329, 343 (2004) (Swafford).

Applying these standards, we conclude that the evidence was insufficient to allow a rational juror to find, beyond a reasonable doubt, either that the defendant participated in the crime by driving the suspect vehicle or that she had the mental state required for a conviction of murder in the first degree on a theory of deliberate premeditation.

a. Participation. The Commonwealth maintains that there was sufficient evidence to establish beyond a reasonable doubt that the defendant drove the suspect vehicle. While "[t]here was no direct evidence offered to prove this proposition, [the] jury . . . could have found" the following. Swafford, supra at 339. First, the defendant had motive to kill the victim, as the victim owed the defendant money, had punched the defendant's boy friend in the face, and had tried to sell back the boy friend's tooth. Second, on the day of the shooting, the defendant drove her mother's Dodge Caravan, the same make and model as the suspect vehicle, and arrived in that Caravan at Calixto's house about twenty minutes after the shooting. Third, multiple calls were exchanged between the defendant's cellular telephone number and those of Castro and Stackermann in the

hours before the shooting.[29]  In addition, no calls were made from her number during a fifteen-minute interval around the time of the shooting, two calls were made from her number to Castro's in the minutes after the shooting, and these latter two calls were transmitted through cellular site 4449, the one closest to the crime scene.[30]  Fourth, the defendant may have displayed consciousness of guilt by claiming to have arrived at Calixto's house around the time of the killing, rather than, as Calixto testified, fifteen minutes later; by claiming not to have known Javier's friends; and by documenting her whereabouts on the day of the killing before being asked by police to do so.  In essence, then, the Commonwealth contends that the verdict was properly based on evidence of (a) motive, (b) the involvement in the crime of the defendant's telephone and her mother's vehicle, and (c) consciousness of guilt.

The jury's determination that the defendant was the driver of the suspect vehicle could have been based on the following inferences from this evidence.  First, they might have inferred that the defendant's motive to kill the victim impelled her

---

[29] Stackermann, in turn, could be tied to the killing by an inference that he left the murder weapon with Medina, who then turned it over to police.  Castro may be connected to the killing by evidence that someone calling from his cellular telephone number requested a taxi pick-up two blocks from the crime scene minutes after the killing.

[30] See note 15, supra.

actually to do so. This inference, by itself, would not have been sufficient to support a conviction because, while existence of motive may make a defendant's participation more likely, see Commonwealth v. Henderson, 47 Mass. App. Ct. 612, 613 (1999) (conviction as coventurer supported by evidence that defendant "had a quarrel with" victim), it cannot be the sole basis for proving such participation. "That [a defendant] . . . had a motive to commit the crime does not . . . mean that he did commit the crime." Swafford, supra at 339.

The jury also reasonably could have inferred consciousness of guilt. However, even if motive and consciousness of guilt are combined, they are insufficient to establish beyond a reasonable doubt that the defendant was the driver, because "evidence of motive and consciousness of guilt is [not] sufficient to withstand [a] defendant's motion for [a] required finding of not guilty."[31] Commonwealth v. Mazza, 399 Mass. 395, 398 (1987).

---

[31] See Commonwealth v. Toney, 385 Mass. 575, 584-585 (1982), and cases cited (acts suggesting consciousness of guilt insufficient to convict because such acts "may often be prompted by something other than feelings of guilt"). Here, the instruction on consciousness of guilt stated that "the defendant may have intentionally made certain false statements" to police about when she arrived "at Ashley Calixto's home." While the statement in question -- that, at 6 P.M., the defendant "was probably on my way to [Calixto's] or in the process of getting there or something" -- could have been a deliberate attempt to conceal her own involvement, it also could have been "prompted by something other than feelings of guilt."

The jury properly could have convicted the defendant, then, only if the evidence of motive and consciousness of guilt were supplemented by other indications that the defendant was the driver of the suspect vehicle.  The Commonwealth points to evidence that the defendant's vehicle and cellular telephone were involved in the shooting, and argues that this suffices "to tip the scales in [its] favor."  See Swafford, supra at 342.  We consider the evidence with respect to each in turn.

i.  Vehicle.  The evidence with regard to the defendant's mother's vehicle could have led a reasonable juror to find that the defendant drove the suspect vehicle only if that juror were willing to "pil[e] . . . inference upon inference."  See id. at 343.  First, the juror would have had to infer that the suspect vehicle was, in fact, the minivan that belonged to the defendant's mother.  While this would have been a reasonable conclusion to draw, as both were Dodge Caravans, it still would have involved an "inferential leap," id., because the Commonwealth's expert did not state that he had been able to

Id. at 585.  For example, it might have been an imprecise estimate or an effort to cover up actions by other people, such as her boy friend Javier or his friends.  See id. ("defendant could have been absent from her home and place of work for reasons consistent with her innocence:  she may have wanted to avoid disclosing the whereabouts of her sister").

match the individual characteristics of the two automobiles.[32]

Second, once the juror inferred that the suspect vehicle was the

defendant's, he or she would have had to infer, further, that

the defendant was the one driving it.

The Commonwealth argues that it is permissible to assume

"that the owner[33] of an automobile is . . . the driver."  See

id. at 340-341.  While "we recognize this logic," it does not

allow the jury to conclude beyond a reasonable doubt that the

defendant was driving, absent some "evidence to suggest that it

is unlikely [the defendant] would have permitted someone else to

drive [her] automobile."[34]  Id. at 341 and cases cited ("we

---

[32] The Commonwealth's vehicle expert also did not provide
any testimony about how likely it was that a given vehicle in
the area would be a Dodge Caravan.  Such vehicles were not
necessarily uncommon.  Indeed, the victim's vehicle also was a
Dodge Caravan.  Cf. Commonwealth v. Mattei, 455 Mass. 840, 855
(2010) ("nonexclusion" testimony that two DNA samples could be
same, or could not, is of minimal probative value "without
accompanying statistical explanation of the meaning of
nonexclusion").

[33] The defendant's mother was named as the insured in the
policy covering the Dodge Caravan the defendant drove, and
apparently used it to commute to work, but also frequently
allowed the defendant to drive it.

[34] This evidence might consist, for example, of testimony
that the vehicle was rarely seen being driven by anyone other
than the defendant.  See Commonwealth v. Swafford, 441 Mass.
329, 341 & n.17 (2004).  The Commonwealth suggests that such
evidence was present here because the defendant answered "Mmm
hmmm," when the detectives asked her whether she was the only
person driving the Caravan that day.  This inconclusive response
could not have been intended as a categorical statement that no
one else drove the Caravan, however, as the defendant stated in

cannot say that [this logic] supports the Commonwealth's conclusion beyond a reasonable doubt" because "concept of automobile owners permitting friends or associates to drive their automobiles certainly is not unusual in common experience or in our cases").  Here, there was no evidence that the defendant maintained exclusive use of her mother's minivan.  To the contrary, in addition to evidence of the defendant's mother's use of the vehicle, there was evidence that Javier drove the Caravan twice on the day of the shooting without the defendant in the vehicle, and once with the defendant as a passenger.[35]

---

the same interview that Javier drove the vehicle shortly before the victim's offer to sell back Javier's tooth.  Compare id. at 341 n.17 (defendant's "sister [stated that she] 'never saw the automobile without defendant . . . ,' thereby suggesting that [defendant] did not permit others to drive his automobile," but "this suggestion is belied by the Commonwealth's evidence that [defendant] asked his sister to [drive] the automobile" on one particular occasion).

[35] The Commonwealth notes that the defendant was in her Caravan approximately twenty minutes after the shooting, when she and Javier arrived at Calixto's house, allowing an inference that she had been in the vehicle twenty minutes earlier, when the shooting occurred.  While perhaps reasonable, this "inferential leap[]" cannot sustain a conviction beyond a reasonable doubt.  See Swafford, supra at 343.  The total distance from the scene of the shooting to Calixto's house -- including a stop at Javier's house, where the defendant told police she had been before she left to visit Calixto -- is slightly more than four miles.  The distance from the scene directly to Calixto's house is also approximately four miles. Thus, even if the defendant's minivan had been used to drop off the coventurers, she could have been picked up after the shooting on the way to visit Calixto.

ii. Cellular telephone. A similar "piling of inference upon inference" would have been required for a reasonable juror to tie the defendant to the crime via her cellular telephone. See Swafford, supra at 343. To find proof of guilt in the calls between the defendant's cellular telephone number and those of Castro and Stackermann, a juror would have had to infer that Stackermann and Castro were involved in the shooting;[36] that the content of these calls related to the shooting; and that the defendant herself was the one making and receiving the calls. This latter inference, although reasonable and probable, is weakened by testimony from the Commonwealth's witnesses that Javier used the defendant's cellular telephone multiple times on the day of the shooting. See id. at 341 ("the presence of an item does not require the presence of its owner").

With regard to the CSLI evidence, the jury would have had to infer, first, that the defendant was in possession of her cellular telephone at the time the CSLI was recorded. As mentioned, this inference, while reasonable, is weakened by evidence of Javier's use of her device. Second, they would have had to infer, from evidence of transmissions through particular cellular sites, that the defendant was at or near the crime scene. In this regard, the Commonwealth focuses on calls to and from the defendant's device transmitted through T-Mobile

---

[36] See note 29, supra.

cellular site 4422, located approximately eight-tenths of a mile from the scene, seven minutes before the shooting.  This evidence, however, establishes little.  On the day of the shooting, twenty-three other calls to and from the defendant's telephone number were transmitted through that cellular site, none of them at times when the Commonwealth maintains that the defendant was near the scene of the shooting.  Indeed, many of those calls were made when the Commonwealth apparently agrees, as the defendant asserts, that she was at home.

Similarly, the Commonwealth points to two calls made in the minutes immediately after the killing, both of which were transmitted through T-Mobile cellular site 4449, the one closest to the scene.  This, too, proves little, as records show that calls to and from the defendant's number were transmitted through that same cellular site six other times on the day of the shooting.  The Commonwealth does not claim that, at these other times, the defendant was at the scene of the killing, and it appears undisputed that two of the calls took place when the defendant was at home.

Moreover, while the Commonwealth's witness testified that "[t]ypically, it[ is] the closest cell site [to the cellular telephone] that will handle [a] signal," he stated that there were "numerous" other factors that affected the determination which cellular site would be used.  He also testified that he

had not investigated what effect such factors might have had in this case, that he did not have the engineering expertise to do so, and that any knowledge he had on the topic came from working with engineers and hearing presentations from them.[37]

iii. <u>Analysis</u>. Given the totality of the evidence, the jury could have inferred that the defendant's vehicle was involved in the shooting because it, like the suspect vehicle, was a Dodge Caravan. The jury also might have inferred that the defendant's cellular telephone was involved, based on the calls to Castro and Stackermann. The jury were not permitted, however, to build further inferences on top of these. See <u>Swafford</u>, <u>supra</u> at 343. See also <u>Commonwealth</u> v. <u>Mandile</u>, 403 Mass. 93, 94 (1988) (<u>Mandile</u>) ("No[] conviction [may] rest upon the piling of inference upon inference or conjecture and

---

[37] While McDonald's testimony appears generally to have been admissible, this is not without some doubt with respect to two of his opinions. Those opinions -- that calls "typically" are transmitted through the closest cellular site, and that a call from Calixto's address was unlikely to have been transmitted through cellular site 4449 -- were objected to by the defendant and may well have required a witness with greater technical expertise. See Blank, The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone, 18 Rich. J. L. & Tech. 1, 3, 6-7, 20 (2011) (at least fourteen factors determine cellular site use; court should not "allow[] . . . lay witness to testify to the intra-cell site position of a phone user because the testimony requires specialized knowledge that relates to the scientific and technological features of cell sites"). See also Cherry, Imwinkelreid, Schenk, Romano, Fetterman, Hardin, & Beckman, Cell Tower Junk Science, 95 Judicature 151, 151 (2012) ("data from a single cell phone tower" not adequate to place caller "within a mile -- or five miles -- or ten miles -- of the tower").

speculation"); Mazza, supra at 399 (while "[a] fair inference may be drawn that the defendant called the victim . . . and arranged to meet him" at time of murder, we cannot "further infer that the defendant [actually] went" and met victim).

In other words, the jury were not entitled, on this evidence, to infer that, if the defendant's minivan and telephone were involved in the killing, the defendant herself was, too. Such an inference is particularly problematic in light of evidence that her vehicle and cellular telephone were borrowed by Javier at various points on the day of the shooting.[38] Swafford, supra at 341-342. That the defendant also had motive and may have displayed consciousness of guilt does not "tip the scales" and allow a different conclusion. See Swafford, supra at 342; Mazza, supra 398-400 (jury is not "permitted to [build] inference upon inference" even where there is "evidence of motive and consciousness of guilt" because those may not be used to "obscure the fact that the Commonwealth's proof failed").

Ultimately, the facts of this case are similar to those in Swafford, supra at 331, 339, where the defendant was accused of having been the driver in a drive-by shooting. Evidence at

---

[38] In Swafford, supra 341 n.17, the evidence on a similar issue showed that the defendant's sister drove an automobile on one occasion four months after the shooting. Here, by contrast, there is evidence that Javier drove the vehicle on three occasions within twenty-four hours of the shooting.

trial showed that the defendant in that case "had a motive to seek retribution" from the victims, id. at 339; had spent time with the shooter in the hours before the killing, id. at 339-340; was the owner of the vehicle used in the shooting, id. at 340-341; and had "demonstrat[ed] . . . consciousness of guilt" by altering the appearance of his vehicle a few months after the shooting.  Id. at 342.  We reversed the conviction because this evidence "established that [the defendant] had a motive to commit the shooting, and that he could have been the driver, but . . . [did] not establish beyond a reasonable doubt that he was in the driver's seat."[39]  Id. at 343.

---

[39] The Commonwealth argues that the evidence is stronger here than in Swafford because, in that case, there was no video recording of the suspect vehicle and no evidence linking the defendant's cellular telephone to the crime.  In that case, however, there was other evidence that is lacking here: witnesses who described the gender and race of the driver (here, there was no evidence as to either), who identified the passenger-shooter by name (here there was no direct evidence of the identities of the passenger-coventurers and the video recording did not show any facial features), and who described the color of the suspect vehicle's exterior, as well as the tint of its windows (here the black-and-white video recording showed only the vehicle's make and model).  See id. at 331.  Moreover, as noted, supra, the indications were more substantial here than in Swafford that someone else, namely Javier, used the defendant's vehicle and telephone on the day of the shooting.  See note 34, supra.

The Commonwealth also contends this case is comparable to Commonwealth v. Henderson, 47 Mass. App. Ct. 612 (1998), where the Appeals Court sustained convictions of assault with intent to murder on a theory of joint venture, and assault and battery by means of a dangerous weapon, under assertedly similar circumstances.  There, however, there was direct evidence that

Here, too, the evidence shows that the defendant had motive to kill the victim, that her possessions (vehicle and cellular telephone) were involved in the killing, and that she displayed consciousness of guilt.  This establishes that she could have been the driver of the suspect vehicle -- indeed, that this was more likely than not to have been the case -- but it does not allow that conclusion to be drawn beyond a reasonable doubt.[40]

b.  Mental state.  As mentioned, the defendant was convicted on the basis that she knowingly, and with deliberate premeditation, aided the coventurers in the commission of murder, i.e., that she was the perpetrators' "joint venturer." See, e.g., Commonwealth v. Britt, 465 Mass. 87, 96-97 (2013). In order to convict the defendant on this theory, the Commonwealth was required to prove, beyond a reasonable doubt, not only that the defendant drove the suspect vehicle, but that

---

the killing took place two minutes after the defendant's quarrel with the victim, that the defendant drove the suspect vehicle, and that the shooter brandished a gun in view of the defendant. Id. at 612-613.

[40] Cf. Commonwealth v. Morris, 422 Mass. 254, 255, 256, 259 (1996) (defendant's fingerprint found on mask dropped at scene by one of five perpetrators, witness stated "that the intruder wearing the . . . mask might have resembled the defendant," defendant's mother owned "vehicle that resembled . . . one seen leaving the crime scene," and defendant had "association with two people who could have been found to" be perpetrators; while "jury could have reasonably inferred that the defendant had been involved with the [the perpetrators] and that he might have been one of the intruders," "evidence [did] not . . . warrant such a conclusion beyond a reasonable doubt").

she knew her passengers intended to kill the victim and that she shared their intent. See Commonwealth v. Nolin, 448 Mass. 207, 217 & n.11 (2007). While such "[m]atters . . . are rarely proved by direct evidence and are most often proved circumstantially" (citation omitted). Commonwealth v. Rosario, 83 Mass. App. Ct. 640, 643 (2013), the circumstantial evidence may not consist solely of a "show[ing] that the defendant . . . was present when the crime was committed," even if that showing is supplemented by evidence that the defendant "knew about [the crime] in advance." Commonwealth v. Zanetti, 454 Mass. 449, 470 (2009) (Appendix) ("Presence alone does not establish a defendant's knowing participation in the crime, even if a person knew about the intended crime in advance and took no steps to prevent it"). Rather, there must be some additional proof that the defendant "consciously . . . act[ed] together [with the principals] before or during the crime with the intent of making the crime succeed." Id.

The Commonwealth points to five indications that the defendant knew of and shared the coventurers' lethal intent. First, the defendant had motive. See Commonwealth v. Simpkins, 470 Mass. 458, 461 (2015) ("evidence of motive" helps "demonstrate the requisite intent"). Second, the defendant planned her visit to Calixto's house hours before the killing, suggesting, perhaps, intent to use the visit as an alibi.

Third, multiple calls were exchanged between the defendant's cellular telephone and those of Castro and Stackermann in the hours before the shooting, suggesting that those three people were planning the crime. Fourth, the perpetrators carried out the shooting immediately after leaving the suspect vehicle, suggesting that the driver dropped them off knowing their purpose. Contrast Mandile, supra at 101 ("murder here occurred after the passenger had [left vehicle and] been alone with the victim for close to fifteen minutes" such that "no shared intent can be drawn from [defendant's] knowledge of the circumstances" [quotation and citation omitted]). Finally, the driver of the suspect vehicle did not immediately drive away after dropping off the perpetrators, but instead turned onto a side street, executed a three-point turn, and then headed back toward the main road to continue on the original course. This maneuver, the Commonwealth argues, had the purpose of "buy[ing] some time" until the killing could be completed, so that the driver could retrieve the perpetrators.[41]

This evidence does not suffice to establish beyond a reasonable doubt that the defendant knew of and shared the

---

[41] Evidence of consciousness of guilt is, appropriately, not cited to prove intent. Commonwealth v. Lowe, 391 Mass. 97, 108 n.6, cert. denied, 469 U.S. 840 (1984) (consciousness of guilt evidence, "while relevant to the issue whether a criminal homicide was committed, is not evidence of malice aforethought").

coventurers' intent. First, the Commonwealth's arguments require the "piling of inference upon inference." See Swafford, supra at 343. They take as initial assumptions both that the defendant drove the suspect vehicle and that she participated in the calls with Castro and Stackermann -- assumptions that, as discussed supra, are themselves based on a series of "inferential leaps" -- and then ask that the jury be allowed to draw further inferences on the basis of those assumptions.

Second, even assuming, as the Commonwealth contends, that the defendant knowingly participated in the attack, there was no evidence that she knew of or shared the coventurers' intent that the attack be deadly, as required for a conviction of deliberately premeditated murder by way of joint venture. The fact that the attack ended up being deadly does not, by itself, prove that the defendant intended this result. See Commonwealth v. Walsh, 407 Mass. 740, 742, 743 (1990) (minutes before attack on victim, defendant warned "there was going to be trouble," and defendant and coventurer then spoke privately "for a few minutes," apparently planning attack; "jury could only have speculated" based on this evidence that defendant "knew that [coventurer] intended to kill" victim); Mandile, supra (insufficient evidence where defendant drove shooter to scene, knew shooter was armed, drove getaway vehicle, and attempted to

conceal crime, but where there was no indication that he knew shooter intended to kill victim).

Where a defendant is tried on the theory that she committed deliberately premeditated murder by way of a joint venture, proof that the defendant knew of and shared her coventurers' lethal intent is crucial, and may come from a variety of sources.  In this case, however, no evidence from any such sources was introduced.  In some cases, there is direct evidence that a defendant intended that the victim be killed.  See, e.g., Commonwealth v. Woods, 466 Mass. 707, 711, 713-714, cert. denied, 134 S. Ct. 2855 (2014) (defendant, who was not shooter, had made "threats to shoot [or kill] the victim"); Commonwealth v. Marrero, 459 Mass. 235, 248 (2011) ("defendant said, 'I'm going to kill you'").  In other cases, knowledge and intent are inferred from a defendant's actions, if those actions, by their very nature, demonstrate lethal intent.  This often occurs when a defendant brings a gun to the scene of the killing, but does not herself fire the fatal shot.  See, e.g., Commonwealth v. Tavares, 471 Mass. 430, 432-433 (2015) (defendant brought gun to scene, chambered bullet, and pointed it at victim's companions; fatal shots fired by coventurer); Commonwealth v. Rosa, 468 Mass. 231, 233-234 (2014) (defendant, one of three shooters, seen holding and firing gun at victim); Commonwealth v. Keo, 467 Mass. 25, 29-30, 39 (2014) (defendant supplied gun, but "no one

saw and could identify the [actual] shooter"); Commonwealth v. Britt, 465 Mass. 87, 88-89 (2013) (defendant brought gun to scene and fired); Commonwealth v. Beneche, 458 Mass. 61, 70-71 (2010) (before killing, defendant told victim "goodbye forever"; defendant participated in suffocating victim; not clear if deadly force applied by him or coventurer).

In yet other cases, intent has been inferred from evidence that a defendant (a) observed a coventurer demonstrate or express lethal intent (e.g., by producing a gun) and (b) thereafter took some step to help carry out that intent. See Commonwealth v. Longo, 402 Mass. 482, 486 (1988) ("jury may infer the requisite mental state [for a joint venture] from the defendant's knowledge of the circumstances and subsequent participation in the offense" [quotation and citation omitted]). For example, in Commonwealth v. Newson, 471 Mass. 222, 226-228 (2015), the defendant saw his coventurer carry and use a gun earlier on the night of the killing, and thereafter drove the coventurer to the site of the fatal shooting. Similarly, in Commonwealth v. Reaves, 434 Mass. 383, 386-387, 392-393 (2001), the defendant was present for the planning of a drive-by shooting while guns were on a nearby couch, rode in the vehicle with the shooters during the killing, and assisted in disposing of the weapons thereafter. See Commonwealth v. Norris, 462 Mass. 131, 133-135, 140 (2012) (defendant saw that coventurer

had gun, made "move . . . that the jury reasonably could have inferred was designed to allow [coventurer] to take a shot" at victim, and kicked victim in face after victim was shot).

Here, no similar types of evidence were introduced. There was no direct evidence of the defendant's mental state. Nor was there was any indication that the defendant acted in a way inherently demonstrating lethal intent. Finally, there was no evidence that she heard the perpetrators express lethal intent, or that she saw them do anything to demonstrate such intent (e.g., displaying weapons) before they were dropped off at the scene of the shooting.[42] On this evidence, even assuming that the defendant was the driver, and even assuming further that she was involved in planning an attack of some sort on the victim, it cannot be said beyond a reasonable doubt that she knew of and

---

[42] The jury had no information, for example, whether the coventurers displayed weapons while in the vehicle. Nor could an inference of such knowledge have been drawn from the conversations alleged to have taken place between her, Castro, and Stackermann, since the contents of those conversations were not before the jury.

Nonetheless, the concurrence argues that the existence of a strong motive was a "sufficient basis," standing alone, "on which the jury could infer that [the defendant] shared the murderous intent of her passengers." Post at . The presence of motive, however, merely strengthens the inference that the defendant intended to participate in an attack of some sort. It does not indicate that the defendant knew of and shared her coventurers' intent that the attack be deadly.

shared her passengers' lethal intent.[43]  See <u>Commonwealth</u> v. <u>Simpkins</u>, 470 Mass. 458, 461-462 (2015) (evidence that defendant helped shooters before killing and was accessory after fact did not necessarily imply "knowing participation . . . in the shooting itself or in the planning thereof").

3.  <u>Conclusion</u>.  In sum, while the evidence at trial established the possibility, perhaps even the probability, that the defendant was the driver of the suspect vehicle, and that she may have shared the intent that the victim be killed, it did not allow a rational juror to so conclude beyond a reasonable doubt.  Accordingly, the judgment is reversed, the verdict is set aside, and the case is remanded to the Superior Court for entry of a judgment for the defendant.

<u>So ordered</u>.

---

[43] Similarly, in <u>Commonwealth</u> v. <u>Mandile</u>, 403 Mass. 93, 100 (1988), we held that there was insufficient evidence of intent where "the defendant (1) participated in stealing guns to aid in the commission of some future offense; (2) was present during the commission of the murder; (3) knew the passenger was armed, (4) was the driver of a getaway car; and (5) attempted to conceal the crime through both the disposal of the murder weapon and inconsistent statements to the police."  On this evidence, it was not "shown that [the defendant] intentionally assisted [the shooter] in the commission of the crime and that he did this, sharing with [the shooter] the mental state required for that crime" (citation omitted).  <u>Id</u>. at 101.

CORDY, J. (concurring in part and in the judgment).  I agree that the evidence regarding whether the defendant was the driver of the Dodge Caravan minivan that transported and dropped off four individuals (at least two of whom were armed with firearms) across the street from the victim's parked minivan, where seconds later they murdered him, may not have been sufficient to allow a rational jury to conclude that fact beyond a reasonable doubt.  Consequently, I concur in the reversal of her conviction.  I disagree, however, with the court's further and unnecessary conclusion, that even were the evidence adequate on that point, there was not a sufficient basis on which the jury could infer that she shared the murderous intent of her passengers.[1]

In my view, the evidence at trial firmly established an intense animosity between the defendant and her boy friend (one of the shooters) and the victim, an animosity that was in part related to money owed to the defendant by the victim -- a debt that was overdue and contentious, and that had been the subject of "loud conversation" between the boy friend and the victim on the day of the shooting.  Indeed, on that same day, the defendant and her boy friend had at least four hostile

_____

[1] I am aware that, of the four defendants charged in this murder, only two were convicted:  Joel Javier (murder in the first degree) and Yoshio Stackermann (murder in the second degree).

encounters with the victim.  At approximately 2 A.M., the victim knocked the boy friend's tooth out in a fight in the presence of the defendant.  The boy friend pulled out a knife during the fight, and after getting punched and losing his tooth, threw his cellular telephone at the victim.  He then told the defendant that it "was not going to stay like that," after which he drove away.  Later that day, while the defendant was driving her boy friend around, the victim drove his minivan head on toward her in an attempt to drive her vehicle off the road.  Still later that afternoon, the victim showed up at the boy friend's house and taunted the defendant and the boy friend's mother -- saying he was "carrying [her boy friend's] tooth" and would sell it back "for a hundred bucks."

This obviously did not sit well with either the boy friend or the defendant, and between 2 P.M. and 5:30 P.M., six telephone calls were made on the defendant's cellular telephone to Yoshio Stackermann to round up some friends.  Between 5:41 P.M. and 5:57 P.M., the defendant (assuming it was she) was driving the boy friend and his three-man posse (in her mother's vehicle) in search of the victim.  When they observed him in his parked vehicle, the defendant stopped the vehicle across the street.  The four passengers jumped out and within seconds fired at least twelve shots at the victim and his vehicle, killing him.  They then fled on foot.  The defendant drove around the

block, picked up her boy friend, and proceeded on to her brother's girl friend's house where they had planned to visit.

In sum, if the evidence had been sufficient to establish her role as the driver, it would have been sufficient to establish her role as a joint venturer in the murder plot.